684 So.2d 1134 (1996)
Daniel L. RHODES and Judy Dupre Rhodes, Individually and on Behalf of Their Minor Daughter, Michelle Rhodes
v.
STATE of Louisiana, through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, and State of Louisiana, through the Department of Public Safety and Corrections.
No. 94 CA 1758R.
Court of Appeal of Louisiana, First Circuit.
December 20, 1996.
*1138 Michael J. Samanie, Houma, for Plaintiffs/1st Appellants, Daniel Rhodes and Judy Dupre Rhodes, et al.
William Dodd, Houma, C.T. Williams and J. Elliott Baker, Metairie, for Defendant/Appellee, State of Louisiana, Department of Transportation and Development.
Jerri Smitko, Houma, for Plaintiffs/1st Appellants, Linda and Bob Watson.
Michael Gee, Thibodaux, for Intervenor/2nd Appellant, Louisiana Farm Bureau Casualty Insurance Company.
Before CARTER, GONZALES and PARRO, JJ.
CARTER, Judge.
This action for damages arising out of an automobile accident is on remand from the Louisiana Supreme Court.

FACTS AND PROCEDURAL BACKGROUND
On April 16, 1991, Linda Watson was traveling north on La. Highway 24 (also known as West Park Avenue) towards the intersection with Oakshire Drive in Houma, Louisiana. At about the same time, Ron Underdonk was traveling west on Oakshire Drive toward the intersection with La. Highway 24 in an automobile owned by Daniel Rhodes; Michelle Rhodes was a guest passenger in that automobile. The intersection of La. Highway 24 and Oakshire was controlled by a semaphore traffic control signal. As Underdonk approached the intersection of La. Highway 24 and Oakshire Drive, the westbound lane of Oakshire was controlled by a green traffic light, and the traffic signal for the northbound lane of La. Highway 24 was also green. Upon entering the intersection, the vehicle Underdonk was operating was struck by the vehicle operated by Watson. As a result of this collision, Michelle Rhodes and Linda Watson sustained injuries.
On July 12, 1991, Daniel and Judy Rhodes, individually and on behalf of their minor daughter, Michelle Rhodes, (Rhodes) filed an action for damages[1] against the State of Louisiana, through the Department of Transportation and Development (DOTD), and the State of Louisiana, through the Department of Public Safety and Corrections (DPS). Rhodes alleged that DOTD was negligent in failing to properly inspect and maintain the traffic control signal, in failing to utilize procedures to assure the proper functioning of the traffic control signal, and in failing to warn of a known hazard. Rhodes also alleged that DPS was negligent in failing to report the malfunctioning traffic control signal and in failing to promptly respond upon receipt of a report of the malfunctioning of the traffic signal. Rhodes also alleged that DOTD was strictly liable for the defective condition of the traffic control signal.
On July 25, 1991, Linda and Bob Watson (Watson) filed an action for damages against DOTD and DPS, alleging negligence with regard to the inspection and maintenance of the traffic control signal and the failure to warn and report the malfunctioning traffic control signal, respectively. Watson also alleged that DOTD was strictly liable for the defective condition of the traffic control signal. By motions and orders, dated August 20, 1991, and September 13, 1991, respectively, the two matters were consolidated for trial. DOTD and DPS answered the petitions, denying the allegations of each petition and alleging that Watson was negligent and that her negligence was a cause in fact of the damages.[2]
After a trial on the merits, the trial court determined that, although DOTD was negligent with regard to its maintenance and care of the traffic signals, Rhodes and Watson were unable to overcome the burden placed *1139 on them by LSA-R.S. 9:2800. Accordingly, the trial court rendered judgment, on March 4, 1994, in favor of DOTD and DPS, dismissing the suits of Rhodes and Watson at their costs. Rhodes filed a motion for leave of court to file an amended petition for damages, which alleged that LSA-R.S. 9:2800 is unconstitutional. Thereafter, Rhodes filed a motion for new trial on the basis that LSA-R.S. 9:2800 is unconstitutional. Watson and Farm Bureau also filed a motion for leave of court to file amended petitions and motions for new trial, alleging the same grounds as were set forth in Rhodes' motions and amended petition.
After a hearing, the trial court denied the motions for leave of court to file amended pleadings and the motions for new trial. In denying the motions to amend, the trial court stated that the pleadings could not be amended after judgment was rendered. In denying the motions for new trial, the trial court stated that the constitutionality of LSA-R.S. 9:2800 could be argued to the appellate court.
On appeal, this court determined that the legislature exceeded its authority by enacting a statute providing that, in a strict liability action against a public entity, a plaintiff must prove that the defendant had actual or constructive knowledge of a vice or defect and failed to remedy it within a reasonable period of time. This court then determined that DOTD was strictly liable and awarded plaintiffs damages. However, this court determined that DPS's response to the report of a malfunctioning traffic signal was prompt and that DPS was not liable to plaintiffs. Rhodes v. State, Department of Transportation and Development, 94-1758 (La.App. 1st Cir. 5/5/95), 656 So.2d 650.
On writ of review, the Louisiana Supreme Court held that the appellate court's declaration of unconstitutionality was not essential to the resolution of the case. Accordingly, the supreme court vacated our declaration of unconstitutionality and remanded the matter to this court to consider whether plaintiffs proved DOTD's negligence under LSA-C.C. art. 2315 and, if so, what damages are due plaintiffs.[3]Rhodes v. State, Department of Transportation and Development, 95-1848 (La.5/21/96), 674 So.2d 239.
Therefore, pursuant to the remand, the only issues before us are whether Rhodes and Watson established that DOTD was liable for negligence under LSA-C.C. art. 2315, and, if so, what damages are due.

STANDARD OF REVIEW
Generally, when one or more trial court legal errors interdict the fact finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court is to make its own independent de novo review of the record and determine a preponderance of the evidence. Ferrell v. Fireman's Fund Insurance Co., 94-1252 p. 7 (La.2/20/95), 650 So.2d 742, 747. In Clement v. Frey, 95-1119 pp. 1-2 (La. 1/16/96), 666 So.2d 607, 612, (Lemmon, J., concurring), it was pointed out that "a de novo review, without any deference to the fact finder, is only appropriate when there is a legal error implicit in the fact finding process or when a mistake of law forecloses the fact finding process, such as when the fact finder's decision has been tainted by an improper and prejudicial jury instruction or erroneously admitted prejudicial evidence." See also Hoyt v. Wood/Chuck Chipper Corp., 92-1498 pp. 3-9 (La.App. 1st Cir. 1/6/95), 651 So.2d 1344, 1356-59, (Gonzales, J., dissenting), writ denied, 95-0753 (La.5/19/95), 654 So.2d 695.
In the instant case, in remanding this matter, the Louisiana Supreme Court noted:
The trial court concluded "that the State was indeed negligent in its maintenance and care of traffic signals, however the Plaintiff was unable to overcome the burden placed on it by R.S. 9:2800." This conclusion is contradictory. To find the DOTD negligent, the trial court logically had to find the plaintiffs overcame the statutory burden for proving strict liability.

*1140 The R.S. 9:2800 "burden" placed on the plaintiffs in proving strict liability was the requirement that they prove DOTD's actual or constructive notice of the particular vice or defect in the traffic signal and that DOTD had a reasonable opportunity to remedy the defect but failed to do so. A finding of DOTD negligence includes the finding that DOTD knew or should have known that something about the traffic signal created an unreasonable risk of injury that resulted in damage and that DOTD failed to render the signal safe or to take adequate steps to prevent the damage caused by the signal. (emphasis added.) (Footnote omitted.)

Rhodes v. State, Department of Transportation and Development, 674 So.2d at 242-43.
Clearly, while the trial court committed legal error in failing to render judgment in favor of Rhodes and Watson after stating that DOTD was negligent, such error does not interdict any specific factual finding by the trial court. Therefore, in reviewing the evidence, we are guided by the manifest error-clearly wrong standard, which authorizes us to reverse a trial court's factual finding only if we find from the record that a reasonable factual basis does not exist for the finding of the trial court or that the record establishes that the finding is clearly wrong. See Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. See Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882-83.

NEGLIGENCE
The standard negligence analysis employed in determining whether to impose liability under LSA-C.C. art. 2315 is the duty/ risk analysis, which consists of the following four-prong inquiry:
I. Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred?
II. Did the defendant(s) owe a duty to the plaintiff?
III. Was the duty breached?
IV. Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
See Mart v. Hill, 505 So.2d at 1122; Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622-23 (1972).
Under a duty/risk analysis, for a plaintiff to recover, all four inquiries must be answered affirmatively. As such, in order for damages to be imposed under a duty/risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of protection element); and, (5) actual damages (the damages element). See Campbell v. Louisiana Department of Transportation & Development, 94-1052 p. 5 (La.1/17/95), 648 So.2d 898, 901; Mathieu v. Imperial Toy Corporation, 94-0952 pp. 4-5 (La.11/30/94), 646 So.2d 318, 322; Roberts *1141 v. Benoit, 605 So.2d 1032, 1041 (La.1991), on rehearing, 605 So.2d 1050, 1051 (La.1991); Fowler v. Roberts, 556 So.2d 1, 4 (La.1989), reh. granted on other grounds and original opinion reinstated as supplemented, 556 So.2d 13 (La.1990), superseded by statute on other grounds as stated in Persilver v. Louisiana Department of Transportation, 592 So.2d 1344, 1347 n. 2 (La.App. 1st Cir.1991); Regional Transit Authority v. Lemoine, 93-1896 p. 12 (La.App. 4th Cir. 11/16/95), 664 So.2d 1303, 1309, writ denied, 96-0412 (La.3/29/96), 670 So.2d 1234. See also Mundy v. Department of Health and Human Resources, 620 So.2d 811, 813 (La.1993); Wilson v. State, Department of Public Safety and Corrections, 576 So.2d 490, 493 (La. 1991); Thomas C. Galligan, Jr., "A Primer on the Patterns of Negligence," 53 La.L.Rev. 1509, 1510 (1993).

A. Duty and Breach
The existence of a duty is clearly a question of law. Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289, 292 (La.1993). The inquiry is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that someone owed him a duty. Faucheaux v. Terrebonne Consolidated Government, 615 So.2d at 292, citing Green, "The Causal Relation Issue and Negligence Law," 60 Mich.L.Rev. 543, 562-63 (1962); Griffin v. Danos and Curole Marine Contractors, Inc., 94-1789 p. 6 (La.App. 1st Cir. 5/5/95), 655 So.2d 525, 528, writ denied, 95-1383 (La.9/15/95), 660 So.2d 451; Ayres v. Beauregard Electric Cooperative, Inc., 94-811 p. 12 (La.App. 3rd Cir. 9/6/95), 663 So.2d 127, 134, writ denied, 95-2432, 95-2434 (La.12/15/95), 664 So.2d 455.
Concerning the duty owed by the state, it is well established that its obligation to motorists is to maintain highways in a reasonably safe condition and to remedy conditions creating an unreasonable risk of harm. Morris v. State, Department of Transportation, 94-2545 p. 5 (La.App. 1st Cir. 10/6/95), 664 So.2d 1192, 1195, writ denied, 95-2982 (La.2/9/96), 667 So.2d 537; Pino v. Gauthier, 633 So.2d 638, 645 (La.App. 1st Cir.1993), writs denied, 94-0243 (La.3/18/94), 634 So.2d 858 and 94-0260 (La.3/18/94), 634 So.2d 859; Dodson v. Webster Parish Police Jury, 564 So.2d 760, 764 (La.App. 2nd Cir.), writ denied, 567 So.2d 1127 (La.1990). Included within this duty is the obligation to maintain traffic control signals. LSA-R.S. 48:193; Maeder v. Williams, 94-0754 p. 15 (La.App. 4th Cir. 11/30/94), 652 So.2d 1005, 1014. See Rick v. State, Through Department of Transportation and Development, 619 So.2d 1149, 1153 (La.App. 1st Cir.1993), affirmed in part, reversed in part, 93-1776, 93-1784 (La. 1/14/94), 630 So.2d 1271.
In the instant case, there is no dispute that the traffic control signal at the intersection of La. Highway 24 (or West Park Drive) and Oakshire Drive in Houma was under the supervision and control of DOTD on April 16, 1991. Therefore, DOTD had a duty to properly maintain the traffic signal. Further, there is no dispute that, at the time of the accident, the traffic signal was malfunctioning, namely it displayed green lights to both drivers. Moreover, the testimony at trial revealed the following.
Dale Falghou, the electrical foreman for DOTD for District 2, which included Terrebonne Parish, testified that every six months he and his crew attempted to perform as much maintenance as possible on every traffic signal in the district. However, he acknowledged that they were unable to do much because the subdistrict is large and has over 300 traffic lights, and he only had two men working in the area. As a result, sometimes these constraints caused them to ignore certain lights for more than six months.
According to Falghou, in April, 1991, there was no system to check the lights on a regular basis. Although there was a maintenance system for the rest of the district, in the previous nine years, DOTD had been unable to develop a system for this subdistrict. As a result, maintenance was performed only when there were no repair calls. In explaining the manner in which maintenance was handled, Falghou testified that maintenance was secondary to repairs, and, when he reviewed worksheets and noticed that maintenance had not been performed in *1142 some time, he would send a signal electrician to perform maintenance.
Falghou explained that the traffic light at the intersection of La. Highway 24 and Oakshire Drive utilized a Kentron controller. A Kentron controller is referred to as a "fixed" timer, which simply means that it has a cam shaft and a dial. The controller also has two contacts, which, when bad, must be replaced. Falghou testified that, although there is no way to avoid contacts burning out, maintenance can help with the problem. Falghou acknowledged that, in his deposition testimony, he stated that Kentron had trained DOTD personnel in maintenance and that the better the maintenance, the better the equipment works and the longer it lasts. Falghou further acknowledged that proper maintenance on Kentron contacts will prevent the contacts from burning out.
With regard to the actual maintenance performed on the traffic light at that intersection, Falghou noted that, nine months prior to the accident (in June, 1990), the controller had been inspected while a repair was being performed on the traffic signal. Falghou testified that, less than three weeks before the accident, his crew had performed maintenance on the traffic signal, but apparently did not check the contacts at that time. On the date of the accident, the contacts were burned out, and Falghou's crew replaced contacts on the traffic signal. Falghou acknowledged that his crew had reported problems with the Kentron controllers, but very little maintenance had been performed at this intersection.
Alfred Joe Martin, Jr., a signal electrician with DOTD, testified that, on April 16, 1991, he replaced a contact and repaired a wire on the controller at the intersection where the accident occurred. Martin testified that, although DOTD employees were supposed to perform maintenance every six months, they were unable to do so because they had repair work every day. Martin acknowledged that he had experienced problems with Kentron contacts in that they burned out or went bad. According to Martin, he could tell by looking when a contact was going bad because it would start to pit. However, when he re-lamped the light at the intersection of La. Highway 24 and Oakshire Drive three weeks prior to the accident, the work report does not reveal that he checked the contacts on the controller.
John Irving Vaughn, a signal engineer with DOTD, testified that maintenance was the responsibility of each district. DOTD had no uniform rules for maintenance of the traffic signals, even though the Engineering Directives and Standards Manual provides that DOTD should have maintenance rules. Vaughn acknowledged, however, that DOTD did not have any requirement that the controllers on traffic signals be periodically maintained, which would include checking the contacts every six months and cleaning them with a brush and solvents. Vaughn admitted that, if a light was performing properly, no maintenance was performed. According to Vaughn, between 1985 and 1992, on more than six occasions, there were problems with the contacts on a particular light. Vaughn also admitted that, although Kentron recommends use of Kentron replacement parts on its controllers and that Kentron voids the warranty if Kentron parts are not used, DOTD used replacement parts of another supplier to repair Kentron equipment. Vaughn testified initially that there were no problems with Kentron controllers. However, Vaughn acknowledged that, because of problems with the contacts on Kentron controllers, he had engaged in discussions with representatives of Kentron, who were very adamant about the need for proper maintenance.
Duane T. Evans, Rhodes' expert in traffic engineering, testified that the controller on a traffic signal is subject to many electrical and mechanical influences that might cause operational malfunctions. Evans noted that the entire controller system is interrelated and that it must be properly maintained to ensure safe working operation. According to Evans, the particular controller on the traffic signal which malfunctioned in the instant case was a Kentron controller, which is prone to encounter difficulties with contacts burning out and with quick cycling. Evans further testified that proper maintenance can keep contacts from burning out as quickly. When he performed an inspection *1143 of the intersection light in December, 1993, Evans observed that the light was functioning properly. However, when he examined the contacts in the controller, the contact was showing signs of burning out and posed a potential problem. Evans testified that Kentron recommends that the contacts on the controller be checked every six months, but that DOTD records revealed that the maintenance program was inadequate. Moreover, Evans opined that the conflicting green signals were caused by improper maintenance by DOTD.
Based upon the evidence presented, it is clear that DOTD had a duty to maintain the traffic signal and that it breached that duty by failing to properly fulfill its maintenance responsibilities. DOTD focused virtually all of its energies and resources on repair work and performed maintenance only as an afterthought when time permitted. In fact, the testimony reflects that DOTD showed little diligence in maintaining the traffic signal. We acknowledge that resource constraints might have limited DOTD's ability to perform routine maintenance on a properly functioning signal; however, DOTD performed repair work on the traffic signal a few weeks prior to the accident giving rise to the instant suit. Despite its knowledge of the importance of vigilant maintenance of Kentron controllers, the signal electrician did not take time during that repair to even check or clean the contacts. A brief amount of time devoted to maintenance of the controller contacts while the technician was performing repair work would have been a minimal interference with the technician's work schedule, and the resulting benefits from such maintenance would have been considerable. With all of the information available to DOTD, it knew or should have known that the failure to properly maintain the contacts on the controller posed an unreasonable risk that the light would malfunction.[4] Considering the gravity of the harm which can result from the failure to properly maintain the controller contacts, DOTD's failure to properly maintain the traffic signal under the particular facts and circumstances presented in the instant case constitutes a clear breach of its duty.

B. Cause-In-Fact
This element of proof is basically factual; it relates solely to conduct, an act or omission that results in harm or damage to another. Ayres v. Beauregard Electric Cooperative, Inc., 663 So.2d at 131. Cause-in-fact is generally a "but for" inquiry. If the plaintiff probably would not have been injured but for defendant's substandard conduct, such conduct is a cause-in-fact. Guzman v. State, 95-0957 p. 11 (La.App. 1st Cir. 12/15/95), 664 So.2d 1343, 1351; Ayres v. Beauregard Electric Cooperative, Inc., 663 So.2d at 131. In other words, the inquiry is whether the defendant contributed to plaintiff's harm. Hutzler v. Cole, 93-0486 p. 9 (La.App. 1st Cir. 3/11/94), 633 So.2d 1319, 1325, writ denied, 94-0850 (La.5/13/94), 637 So.2d 1070. To the extent that the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. Ayres v. Beauregard Electric Cooperative, Inc., 663 So.2d at 131.
In the instant case, the evidence shows that a burned-out contact in the controller would cause the traffic signal to malfunction and that the contacts in the controller were burn out at the time of the accident. There is no dispute that the signal light at the intersection malfunctioned at the time of the accident, in that the light for the lanes of travel at the intersection was green for both drivers. As we noted in our original opinion, a "malfunctioning traffic light evidencing a green light to both east and west bound traffic as well as to both north and south bound traffic is one of the most dangerous and hazardous situations that motorists can encounter." Rhodes v. State, Department of Transportation and Development, 656 So.2d at 663. Upon observing a green light, both drivers properly assumed that they had the right of way to proceed through the intersection. *1144 But for the malfunction, which gave both drivers a green light, the accident would not have happened. Moreover, as a result of the accident, the driver of one vehicle and a passenger in the other sustained injuries.

C. Scope of Protection
The scope of protection inquiry is a question of policy whether the particular risk falls within the scope of the duty. See Faucheaux v. Terrebonne Consolidated Government, 615 So.2d at 293. "[T]he `ease of association' [test] ... melds policy and foreseeability...." Roberts v. Benoit, 605 So.2d at 1054. The duty risk analysis is "highly fact-intensive" and the scope of protection inquiry "factbound." See Roberts v. Benoit, 605 So.2d 1032, 1055 (La.1991). In Faucheaux v. Terrebonne Consolidated Government, 615 So.2d at 293-94, the court stated:
Rules of conduct are designed to protect some persons under some circumstances against some risks. The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner.... In determining the limitation to be placed on liability for defendant's substandard conduct, the proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. (citations omitted).
In the instant case, DOTD's duty to maintain traffic signals includes the risk that an individual might be injured in an accident which results from the malfunction of those signals. The duty is designed to protect that individual from such an accident.
We have thoroughly reviewed the entire record under the manifest error-clearly wrong standard and determine that the evidence supports the conclusion that DOTD was negligent in its maintenance of the traffic signal light in the instant case and, accordingly, is liable to Rhodes and Watson for the resulting damages.
In our previous opinion, we examined the entire record and awarded damages to Rhodes and Watson. Because the issue of damages is again presented for consideration on remand, we reiterate and confirm our initial damage awards as follows.

D. Damages

A plaintiff bears the burden of proving the causal connection between an accident and injury (damage) by a preponderance of the evidence. Thomas v. Hartford Insurance Company, 540 So.2d 1068, 1074-75 (La.App. 1st Cir.), writ denied, 542 So.2d 516 (La.1989). A tort feasor is only liable for damages caused by his intentional or negligent act; he is not liable for damages caused by separate, independent, or intervening causes. Thomas v. Hartford Insurance Company, 540 So.2d at 1075. However, a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993); American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991); McCray v. Abraham, 550 So.2d 244, 247 (La.App. 4th Cir. 1989).
1. General Damages
An award of "general damages" involves mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App. 1st Cir.), writs denied, 605 So.2d 1373, 1374 (La. 1992). The primary objective of awarding general damages is to attempt, with monetary compensation, to restore the injured party to the state the party was in at the time immediately preceding injury. McCray v. Abraham, 550 So.2d at 248. The factors to be considered in assessing quantum for pain and suffering are severity and duration. White v. Longanecker, 93-1122, p. 4 (La.App. 1st Cir. 5/23/94), 637 So.2d 1213, 1215, writ denied, 94-1704 (La.10/7/94), 644 So.2d 640; Glasper v. Henry, 589 So.2d 1173, 1180 (La. App. 4th Cir.1991), writ denied, 594 So.2d 1315 (La.1992); Anthony v. Hospital Service District No. 1, 477 So.2d 1180, 1186 (La.App. 1st Cir.1985), writ denied, 480 So.2d 743 (La.1986). There is no mechanical rule for *1145 determining general damages and the facts and circumstances of each case must control. Boudreaux v. Farmer, 604 So.2d at 654.

a. Michelle Rhodes
According to the testimony of Michelle Rhodes and her parents, at the time of the accident, Michelle was a seventeen-year-old high school senior and resided with her parents. Prior to the accident, Michelle had no health problems. As a result of the accident, Michelle suffered lacerations of the scalp, myofascial strains of the cervical and thoracic regions, and a displaced and an open fracture of the mandible (lower jaw bone).
Immediately following the accident, Michelle was hospitalized and underwent surgery to repair her fractured mandible. During the surgery, three titanium bone plates and twelve screws were placed in her mandible. The plates and screws were later removed in a second surgical procedure.
Since the accident, Michelle had experienced a slight disruption in her bite, sensitivity in her teeth, pain in her chin at the fracture sites, pain in her neck and back, dizziness, and TMJ (temporomandibular joint syndrome). Additionally, at the time of trial, Michelle was continuing to suffer from frequent and severe headaches.
Dr. David Crocket Blythe, Jr., a dentist who specializes in oral and maximal fascial surgery, testified that he treated Michelle in the emergency room of Terrebonne General Hospital on April 16, 1991. According to Dr. Blythe, his examination revealed that Michelle sustained two fractures in her lower jaw bone, had several superficial lacerations to her head, and bruising and swelling. Dr. Blythe presented two options, namely, surgical treatment to place bone plates in the jaw or wiring the jaw shut. The Rhodes selected the surgical treatment, which, in Dr. Blythe's opinion, was the better choice. During the surgery, Dr. Blythe first addressed the displaced fracture in Michelle's chin, properly aligning it. He then adapted small bone plates to fit her jaw and attached the plates to Michelle's jaw bone with several small screws. Dr. Blythe next addressed the open fracture, adapting three small bone plates and attaching them with twelve screws. According to Dr. Blythe, Michelle was discharged from the hospital the following day.
Michelle was required to be on a liquid or semi-solid diet for six weeks so that she would not be required to chew. Dr. Blythe examined Michelle numerous times over the six weeks following her surgery, during which Michelle complained of swelling, numbness in her lip, pain in her chin, and soreness in her front teeth. When Michelle presented complaints regarding her teeth, Dr. Blythe referred her to Dr. Jerome Walker. X-rays taken on June 25, 1991, revealed that the fractures were well-healed and solid.
In October, 1991, Michelle voiced complaints of pain in her chin. Michelle was readmitted for outpatient surgery on November 27, 1991, when Dr. Blythe removed the plates and screws from her jaw. Dr. Blythe again saw Michelle on June 24, 1992, for symptoms of TMJ, including pain and headaches. Dr. Blythe prescribed an anti-inflammatory drug and a muscle relaxant, which appeared to relieve some of the pain. According to Dr. Blythe, by August 11, 1992, all of Michelle's problems appeared to have resolved.
Dr. Dexter A. Gary, orthopedic surgeon, testified via deposition. Dr. Gary testified that he first examined Michelle on April 30, 1991. Michelle's medical history revealed that she had been involved in an automobile accident on April 16, 1991. After an examination, Dr. Gary determined that Michelle suffered a myofascial strain of the parascapula musculature. He prescribed a non-steroid anti-inflammatory drug and suggested that she return in six to twelve weeks. On June 24, 1991, Michelle returned to his office with complaints of occasional neck pain. Dr. Gary's examination yielded normal results. However, given Michelle's persistent complaints of pain, Dr. Gary scheduled an MRI of the cervical and thoracic spine, which was performed on July 11, 1991. The MRI of the thoracic spine was normal, but an MRI of the cervical spine had not been done. Dr. Gary then ordered another MRI, which again yielded normal results. On September 3, 1991, Dr. Gary discharged Michelle from his care without any restrictions. According to *1146 Dr. Gary, on October 21, 1991, Michelle called, complaining of continued pain, and requested additional medication. Dr. Gary testified that he last saw Michelle on January 28, 1992, when she complained of neck pain and dizziness. Dr. Gary opined that she had a myofascial strain and that some of these symptoms were residual from her jaw fracture. Dr. Gary testified that Michelle's prognosis is excellent and that she will eventually be pain free.
Dr. Jerome Walker, a dentist, testified that he first examined Michelle on January 15, 1992, on referral from Dr. Blythe. Dr. Walker checked Michelle's bite and determined that her bite was slightly off. He then examined Michelle in April, 1992, for sensitivity of her teeth and determined that her teeth were not in need of any treatment. Dr. Walker did not examine Michelle after April, 1992.
Based upon the above, we find an award of $100,000.00 to be appropriate.

b. Linda Watson
Linda Watson testified that, as a result of the accident, she suffered contusions to her chest and abdomen. She also received a contusion to her knee, as well as numerous lacerations to her feet. Immediately after the accident, Watson was taken to the emergency room. Thereafter, Watson was treated by Drs. Ray A. Cinnater and Thomas H. Givens. Watson testified that the contusion to her abdomen became calcified and had not disappeared as of the date of the trial. Watson described the calcification as approximately two inches in length and one-half to three-quarters of an inch in width, which was located below her naval. According to Watson, after approximately six months, she was able to return to her normal routine.
Bobby Watson testified that his wife, Linda, was in shock when he arrived at the emergency room on the afternoon of April 16, 1991. According to Watson, Linda was unable to perform her normal activities for approximately six months following the automobile accident.
Dr. Ray A. Cinnater, a specialist in internal medicine, testified via deposition. Dr. Cinnater testified that he first examined Linda Watson on April 18, 1991. His examination revealed numerous bruises and contusions, including a contusion and bruise approximately six inches by three inches on her abdomen, and lacerations on her right foot. Dr. Cinnater advised Watson to continue taking the medication prescribed by Dr. Givens in the emergency room, but did not place her under any restrictions.
Dr. Thomas H. Givens testified, via deposition, that he initially examined Linda Watson in the emergency room immediately following the automobile accident. Thereafter, on April 25, 1991, Dr. Givens treated Watson in his office. At that time, his examination revealed a contusion of the chest, a large hematoma, and a burn on the lower abdomen. Dr. Givens prescribed medication and advised Watson to apply moist heat to the hematoma on her abdomen. On September 13, 1991, Watson still had a large mass where the hematoma was on her abdomen, which Dr. Givens indicated might result in calcification. Dr. Givens indicated that, if the mass remained and presented discomfort or problems, it could be removed.
Based upon the above, we find an award of $10,000.00 to be appropriate.

2. Loss of Consortium

The compensable elements of a claim for loss of consortium of a spouse include loss of love and affection, loss of companionship, loss of material services, loss of support, impairment of sexual relations, loss of aid and assistance, and loss of felicity. Higley v. Kramer, 581 So.2d 273, 282 (La. App. 1st Cir.), writ denied, 583 So.2d 483 (La.1991). See Rossitto v. Jinks, 576 So.2d 1115, 1117 (La.App. 3rd Cir.1991). The elements of a parent's claim for the loss of consortium are essentially the same, without, of course, the sexual component. See Higley v. Kramer, 581 So.2d at 282.

a. Daniel and Judy Rhodes
The evidence presented at trial revealed that both parents cared for Michelle after the accident. Judy Rhodes testified that she cared for her daughter daily for almost two months after the accident and *1147 had to help her daughter with almost everything. Moreover, prior to the accident, Michelle helped her parents with chores. Since her accident, Michelle has not been able to render assistance because of the pain she suffers.
We have carefully reviewed the entire record in this matter and find that the record supports an award of $3,500.00 to Judy Rhodes and $1,500.00 to Daniel Rhodes for the loss of service and society of their daughter.

b. Bob Watson
The evidence presented established that, after the accident, Bob Watson assisted his wife with the household chores. Her mother and sister assisted with meal preparation since Mr. Watson did not cook. He also testified that he assisted with transportation for his wife to return to work, dropping her off in the morning and often picking her up in the afternoon. Mr. Watson testified that his personal relationship with his wife was affected in that he had to be careful around Linda because of her injuries.
We have carefully reviewed the entire record in this matter and find that the record supports an award of $2,500.00 to Bob Watson for the loss of consortium of his wife.

3. Mental Anguish to Third Parties

Louisiana jurisprudence supports an award for mental anguish and emotional distress arising out of injury to another when that person comes upon the scene of the event soon thereafter, provided that the trauma suffered by the victim is such that it can be reasonably expected that one in plaintiff's position would suffer serious and foreseeable mental anguish from the experience. LSA-C.C. art. 2315.6; Lejeune v. Rayne Branch Hospital, 556 So.2d 559, 570 (La.1990). Moreover, the court in Lejeune noted that mental anguish for injury to a third person should only be allowed where the emotional injury is both severe and debilitating.
We have carefully reviewed the entire record in this matter. From their testimony, we acknowledge that the Rhodes were understandably upset upon viewing their child at the scene of the accident and shortly thereafter. However, we cannot say that the emotional distress suffered by the Rhodes was severe or debilitating so as to warrant an award for damages for mental anguish to a third party. The same is true of the emotional distress experienced by Bob Watson upon seeing his wife in the hospital shortly after the accident. Therefore, the Rhodes and Bob Watson are not entitled to an award for mental anguish.

4. Lost Wages

In order to recover for actual wage loss, a plaintiff must prove that he would have been earning wages, but for the accident in question. See Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 522 So.2d 1144, 1152 (La.App. 2nd Cir.1988). In other words, it is the plaintiff's burden to prove past lost earnings and the length of time missed from work due to the accident. ANMAC Foundation, Inc. v. St. Patrick Hospital of Lake Charles, 594 So.2d 951, 956 (La.App. 3rd Cir.1992). Past lost earnings are susceptible of mathematical calculation from proof offered at trial and requires such proof as reasonably establishes the claim. This proof may consist of the plaintiff's own testimony. McDonough v. Royal Sonesta, Inc., 626 So.2d 438, 440 (La.App. 4th Cir. 1993); Woolfarth v. City of New Orleans, 572 So.2d 1194, 1196 (La.App. 4th Cir.1990). However, to allow a plaintiff to recover damages for lost wages when there is no independent support of plaintiff's claim is highly speculative. McDonough v. Royal Sonesta, Inc., 626 So.2d at 440; Hicks v. Barney, 526 So.2d 391, 392 (La.App. 4th Cir.1988). An award for past lost wages is not subject to the much discretion rule. Ammons v. St. Paul Fire and Marine Insurance Company, 525 So.2d 60, 65 (La.App. 3rd Cir.), writ denied, 525 So.2d 1045 (La.1988).

a. Michelle Rhodes
Michelle Rhodes testified that, at the time of the accident, she was working as a cashier for Winn Dixie. She received a wage of $4.25 per hour and averaged seventeen hours per week. Michelle testified that, although her doctor advised her that she *1148 could return to work within three weeks after the accident, she did not return to her position with Winn Dixie after the accident. Michelle testified that she simply did not feel well enough to return for more than a year.
Based upon this testimony, we find that the record supports an award of past lost wages for the three weeks when, according to Michelle, she was advised not to return to work by her doctor. Although none of the medical testimony addressed the issue of lost wages, given that Michelle underwent surgery, it is reasonable that she would have been unable to work for the three weeks following the accident. Accordingly, Michelle is entitled to past lost wages in the amount of $216.75.

b. Linda Watson
The W-2 wage statements for 1991 and 1992 reveal that Linda Watson earned $1,750.00 less in 1991 than she did in 1992. However, Watson's testimony revealed that she missed approximately three weeks of work as a result of the injuries which she received in the April 16, 1991, automobile accident. Watson testified that she earned approximately $5.00 per hour and worked a forty-hour week. According to Watson, she sustained lost wages of approximately $600.00. Accordingly, we find that Watson is entitled to past lost wages in the amount of $600.00.

5. Past Medical Expenses

A plaintiff may ordinarily recover reasonable medical expenses, past and future, which he incurs as a result of the injury. Dowe v. Grady, 540 So.2d 1040, 1045 (La.App. 2nd Cir.1989). However, a plaintiff must prove the existence of the injuries and a causal connection between those injuries and the accident. The test is whether plaintiff has shown through medical testimony that more probably than not the subsequent medical treatment was necessitated by the trauma suffered in the accident. Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144, 156 (La.App. 3rd Cir.), writ denied, 565 So.2d 450 (La.1990).
When a plaintiff alleges that he incurred medical expenses and that allegation is supported by a bill, unless there is sufficient contradictory evidence or reasonable suspicion that the bill is unrelated to the accident, it is sufficient to support the inclusion of the item in the judgment. Brightman v. Regional Transit Authority, 543 So.2d 568, 570-71 (La.App. 4th Cir.1989).

a. Michelle Rhodes
In the instant case, the uncontroverted evidence at trial established that Michelle Rhodes incurred medical expenses as a result of the accident totaling $20,685.14. Therefore, we find that the Rhodes are entitled to an award of past medical expenses in that amount. Farm Bureau is entitled to $5,000.00 of the $20,685.14 on its subrogation claim for the medical payments benefits paid on behalf of Michelle.

B. Linda Watson
In the instant case, the evidence established that Linda Watson incurred medical expenses as a result of the accident totaling $1,586.25 and that Watson is entitled to an award for past medical expenses for that amount.

6. Future Medical Expenses

An award for future medical expenses is in great measure highly speculative and is not susceptible of calculation with mathematical certainty. Gaspard v. Breaux, 413 So.2d 288, 292 (La.App. 3rd Cir.1982). However, like any other element of damage, future medical expenses must be established with some degree of certainty. Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 522 So.2d at 1149. An award for future medical expenses will not be supported in the absence of medical testimony that they are indicated and setting out their probable cost. Brumfield v. Guilmino, 93-0366 p. 7 (La.App. 1st Cir. 3/11/94), 633 So.2d 903, 908, writ denied, 94-0806 (La.5/6/94), 637 So.2d 1056.

a. Michelle Rhodes
With regard to future medical expenses, Dr. Blythe testified that, if Michelle *1149 continued to suffer from flare-ups with her TMJ, she would require future medical treatment to address the problem, including orthodontics. Based on the fact that Michelle was experiencing flare-ups more than three years after the accident, Dr. Blythe opined that, with a reasonable degree of medical certainty, Michelle would require future orthodontic treatment. Dr. Blythe estimated that such treatment would cost approximately $6,000.00. Based upon this testimony, we find that the record supports a finding that Michelle is entitled to an award of $6,000.00 for future medical expenses.

B. Linda Watson
Although Linda Watson testified that she might have to undergo future surgery to remove the calcified mass in her abdomen, the medical testimony suggested that the future surgical procedure is not probable. The record does not support an award for future medical expenses for Linda Watson.

7. Property Damage

The measure of damages for the value of an automobile is the pre-accident market value, less salvage value. Bonner v. Louisiana Indemnity Company, 607 So.2d 915, 917 (La.App. 2nd Cir.1992).

a. The Rhodes
The testimony and documentary evidence presented at trial established that the 1986 Honda Prelude owned by the Rhodes was declared a total loss as a result of the April 16, 1991, automobile accident. The value of the vehicle at that time was $7,900.00. Accordingly, damages for property damage are awarded to the Rhodes in the amount of $7,900.00.

b. The Watsons
Similarly, the testimony and documentary evidence presented at trial established that the 1985 Oldsmobile Cutlass owned by Watson was declared a total loss as a result of the April 16, 1991, automobile accident. Linda Watson testified that her vehicle was valued at approximately $4,900.00. The documentary evidence presented established that the value of the vehicle at that time was $4,850.00. Accordingly, damages for property damage are awarded to Linda Watson in the amount of $4,850.00.

CONCLUSION
For the above reasons, that portion of the trial court judgment in favor of DOTD and against Rhodes, Watson, and Farm Bureau is reversed. Judgment is rendered as follows:
1. In favor of Michelle Rhodes in the sum of $100,000.00 for general damages, $216.75 for lost wages, and $6,000.00 for future medical expenses;
2. In favor of Daniel and Judy Rhodes in the amount of $15,685.14 for medical expenses, $7,900.00 for property damages, and $5,000.00, collectively, for loss of consortium;
3. In favor of Linda Watson in the amount of $10,000.00 for general damages and $600.00 for past lost wages; in favor of Linda and Bob Watson for $1,586.25 for medical expenses and $4,850.00 for property damage; and in favor of Bob Watson for $2,500.00 for loss of consortium; and
4. In favor of Farm Bureau and against DOTD for $5,000.00 for medical expenses.
In all other respects, the judgment of the trial court is affirmed. DOTD is cast for all costs in the amount of $2,401.45.

AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
PARRO, J., concurs with reasons.
GONZALES, J., concurs for the reasons assigned by PARRO, J.
PARRO, Judge, concurring.
I concur to make clear that we do not, by this opinion, suggest that DOTD was liable simply because its maintenance procedures were inadequate, resulting in a malfunctioning traffic signal that caused the accident and plaintiffs' consequential injuries. Rather, this opinion addresses a specific set of factual circumstances which, under these narrowly prescribed conditions, mandate the imposition of liability. In this case, a vital component of a traffic signal was known to be *1150 prone to intermittent failure. Additionally, DOTD knew the failure of this component would certainly result in a malfunctioning traffic signal; it knew the impending failure of this component could be detected by visual inspection; and it knew such failure could be prevented simply by replacing the faulty component. Moreover, the manufacturer of the component had strongly emphasized that the only way to prevent failures was with a regular maintenance procedure. DOTD had such a procedure in place throughout a prescribed district, but had not in nine years developed a scheduled maintenance plan for the large subdistrict where this intersection was located.
We recognize that budgetary and manpower restrictions might limit DOTD's ability to provide regular preventive maintenance on all 300 traffic signals in the subdistrict. Nevertheless, it could and should at least have checked this component, which it knew to be unreliable, on those occasions when other repair work had to be performed on the traffic signal. In this case, had DOTD simply inspected the Kentron contacts three weeks before the accident when its technician was already at the site performing other work on the traffic signal, the signs of potential burn-out could have been detected and the contact replaced. By failing to take even this obvious precaution, DOTD breached its duty to the motoring public, including plaintiffs.
Accordingly, I concur.
NOTES
[1] Michelle Rhodes subsequently attained the age of majority, and by amended petition, dated April and by amended petition, dated April 13, 1992, was added as a plaintiff.
[2] On May 15, 1992, Louisiana Farm Bureau Casualty Insurance Company (Farm Bureau), automobile liability insurer of the Rhodes vehicle, intervened in the proceedings, naming as defendants DOTD, DPS, and Watson. Farm Bureau alleged that it made payments under the medical payments coverage of its policy on behalf of Michelle Rhodes and was legally and conventionally subrogated to any rights Rhodes may have with regard to those items of damage.
[3] In Rhodes v. State, Department of Transportation and Development, 95-1848 p. 5 (La.5/21/96), 674 So.2d 239, 241 and 242, n. 4 and 5, the court observed that "[t]he court of appeal properly reviewed DPSC's negligence, which was the only cause of action asserted against it." Therefore, any issues regarding DPS are not before us on this remand.
[4] In remanding the matter to this court, the Louisiana Supreme Court noted that there was "substantial evidence introduced by plaintiffs which tended to prove DOTD knew or should have known that its maintenance and care of the traffic signal created an unreasonable risk of harm." Rhodes v. State, Department of Transportation and Development, 674 So.2d at 243.