QUALITY DESIGN AND CONSTRUCTION, INC.
v.
CAPITAL GLASS COMPANY, INC.
No. 2008 CA 0838.
Court of Appeals of Louisiana, First Circuit.
October 31, 2008.
NOT DESIGNATED FOR PUBLICATION
SCOTT E. FRAZIER, CHRISTOPHER R. RUTZEN, Counsel for Plaintiff/Appellee Quality Design and Construction, Inc.
JOHN A. BRUNINI, STEPHEN J. CARMODY, Counsel for Defendant/Appellant Capital Glass Company, Inc.
Before: CARTER, C.J., WHIPPLE and DOWNING, JJ.
WHIPPLE, J.
This matter is before us on appeal by a subcontractor, defendant Capital Glass Company, Inc. ("Capital"), from a trial court judgment awarding the contractor plaintiff Quality Design and Construction, Inc., ("Quality"), damages resulting from Capital's failure to perform its obligations under two agreements. We affirm.

PROCEDURAL HISTORY AND FACTUAL BACKGROUND
Quality was selected as the general contractor on the United States Army Corps of Engineers (the "Corps") construction project known as the J. Bennett Johnston Waterways Regional Visitors Center project in Shreveport (the "Project"). Capital was one of Quality's subcontractors on two separate jobs for the Project. In connection with the construction project, the Corps provided architectural drawings for use by prospective bidders for the general contractor award and by prospective subcontractors in the pre-bidding process and post-award period. During the pre-bidding period, Capital submitted a proposal to Quality to fabricate and install the Project's curtain wall system for a price of $109,900.00, and a separate proposal to fabricate, but not install, the aluminum composite panel wall system for the exterior wall of the Project for a price of $91,300.00
On March 22, 2004, Quality issued a notice to Capital to proceed with the curtain wall system job for the bid price of $109,900.00. Quality also forwarded its standard subcontractor's agreement for the curtain wall system job. However, the parties never executed a written subcontract agreement for the curtain wall system job.
On March 23, 2004, Quality issued a purchase order to Capital to fabricate the panels for $90,300.00, which was $1,000.00 lower than Capital's bid. Before it would begin work on the panel job, Capital required that Quality sign a document containing eleven terms and agreements. On May 5, 2004, Quality's project manager, David Nail, signed the terms-and-conditions document for the panel purchase agreement.
Before fabrication of the component parts of the two jobs could begin, Capital was required to submit complete shop drawings to Quality based on the pre-bid architectural drawings. In turn, Quality would forward the submissions to the Corps for approval.[1] Initially, the parties exchanged general information concerning the Project. Capital also made a request for additional information on the panel job. Soon after, Nail began making weekly calls to his contact at Capital, Robert Hamm, to inquire about Capital's progress on the shop drawings.
Within a few months of entering into the curtain wall agreement and the panel purchase order, conflicts arose between the parties concerning Capital's lack of progress in producing complete shop drawings, Quality's demands for the submissions, Capital's demand for an additional $1,000.00 on the panel-purchase order to comply with Capital's bid price, Capital's refusal to release shop drawings until a revised purchase order was issued, and Capital's demand for an additional $15,000.00 on the panel jobs.
The conflict escalated to the point where Quality denied Capital's request for the $15,000.00 increase on the panel job, and Capital notified Quality that it had stopped production on the shop drawings and would not resume work unless it received the $15,000.00 increase. Quality informed Capital that if it refused to perform for the price on the panel purchase order, Quality would cancel Capital's contracts, find a substitute subcontractor, and sue Capital for any additional costs it incurred.
After the parties exchanged a series of strongly worded letters, Capital relented and agreed to perform for the price listed on the panel purchase agreement. However, Capital required that Quality execute the curtain wall system contract with the contract amendments and exclusions Capital had previously submitted. Quality refused to modify its standard subcontractor agreement. Capital responded that the refusal was problematic and that Capital required the modifications. Quality then cancelled both contracts and entered into its standard subcontractor's agreement with a substitute subcontractor, Ace Glass, Inc. ("Ace"), to perform the curtain wall system and panel jobs.
Thereafter, Quality filed suit against Capital to recover the increased cost incurred by Quality on the two jobs due to Capital's failure to perform its obligations. In response, Capital filed a reconventional demand, seeking to recover lost profits and damages arising out of Quality's wrongful termination of the agreements. After a bench trial, where the trial court issued factual findings, the trial court granted judgment in favor of Quality in the amount of $54,870.00. Capital then filed the instant suspensive appeal.

STANDARDS OF REVIEW
Capital raises six assignments of error through which it asserts that the evidence does not support the trial court's factual findings that Quality was justified in terminating both contracts and that Quality was entitled to damages in the amount of $54,870.00. Alternatively, Capital contends that the trial court's factual findings were interdicted by its legal error in failing to apply an adverse presumption with regard to Quality's alleged disposal of certain evidence.
With regard to the trial court's factual findings, an appellate court cannot reverse factual findings unless it finds both that no reasonable factual basis exists for the finding and that it is manifestly erroneous or clearly wrong. Stobart v. State, through Department of Transportation and Development, 617 So. 2d 880, 882 (La. 1993). Moreover, in applying this standard, a trial court's credibility determinations are entitled to great deference. See State ex rel. Thibodeaux v. State, 2001-2510 (La. 3/8/02), 811 So. 2d 875 (per curiam). If the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse. Consequently, where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Marie v. John Deere Insurance Company, 96-1288 (La. App. 1st Cir. 3/27/97), 691 So. 2d 1327, 1333.
With regard to Capital's contention that the trial court committed legal error, we note that if a party is entitled to a legal presumption and the trial court fails to apply the presumption, legal error results. Johnson v. State through Department of Public Safety and Corrections, 95-0003 (La. App. 1st Cir. 10/6/95), 671 So. 2d 454, 457, writ denied, 95-2666 (La. 1/5/96), 667 So. 2d 522. When the legal error interdicts the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court must conduct a de novo review of the entire record and determine a preponderance of the evidence. Rhodes v. State through Department of Transportation and Development, 94-1758 (La. App. 1st Cir. 12/20/96), 684 So. 2d 1134, 1139, writ not considered, 97-0242 (La. 2/7/97), 688 So. 2d 487; see also Johnson, 671 So. 2d at 457. If, on the other hand, the legal error does not interdict any specific factual finding by the trial court, the appellate court is guided by the manifest error-clearly wrong standard in reviewing the evidence. Rhodes, 684 So. 2d at 1140.

First and Second Assignments of Error
In these assignments of error, Capital argues that the trial court erred in failing to find that there was a mutual error by Capital and Quality concerning the dimensions of the panels on the radius wall of the project, or, alternatively, that Capital knew (or should have known) that Capital's bid was based on an error because the panel bid was unreasonably low. Capital also contends that the trial court erred in failing to apply an adverse presumption against Quality. According to Capital, Quality discarded the other proposals it received on the panel job during the pre-bidding process, which prevented Capital from proving that Quality knew or should have known that Capital's bid was based on a significant mistake. Capital contends that had the trial court not committed these errors, Capital would be entitled to rescission of the contract under Louisiana's civil code articles concerning error as a vice of consent. LSA-C.C. arts. 1948 through 1952.
At the outset, we note that Capital's answer and reconventional demand did not assert factual allegations of either mutual or unilateral error; nor did Capital request rescission of the contract based on any error or vice of consent. Moreover, Capital did not raise these issues in its pretrial memorandum of law. However, because the transcript of the trial shows that witness testimony was elicited at trial concerning whether or not the unique dimensions of the panels on the radius wall were discernable from the bid drawings provided by the Corps, we have elected to review these two assignments of errors.
Lee Connell, who was qualified at trial as an expert in architecture, testified that Capital did not have a clear understanding of the scope of the panel work when it bid the job, and that the dimensions for the panels on the radius wall were determinable from the bid plans. Connell testified that the pre-bid drawings showed that the panels for the flat-wall portion of the building were regular shaped. He also provided a thorough explanation of the fact that the pre-bid drawings showed there was a curved wall section of the building that was irregularly shaped and the panels started to become less of a rectangle and more of a trapezoid. Connell testified that it appeared that the design architects intended this portion of the Project to resemble the bow of a ship. Connell testified that based on these drawings, it was impossible to have each panel in each row on the curvature section of the wall be of the same size. While conceding that the Project was challenging, Connell testified that interpreting the drawings as providing for the panels to be the same dimension on each row of the radius wall section of the Project was not an excusable or understandable mistake for someone in the business of providing these sorts of panels for construction projects. Quality's president, Bart Melancon, and Project Manager, Nail, also testified that the architectural pre-bid drawings provided sufficient information to allow any bidder or interested party to determine that the dimensions of each panel on the radius wall would be unique. Conversely, Capital's president, Christopher Cox, testified that in his opinion, the unique dimensions of the radius panels could not be determined or reasonably ascertained from the pre-bid architectural drawings.
Where factual findings are based on determinations regarding the credibility of witnesses., the trier of fact's findings demand great deference and are virtually never manifestly erroneous or clearly wrong. Tunnard v. Simply Southern Homes, L.L.C., XXXX-XXXX (La. App. 1st Cir. 3/26/08), 985 So. 2d 166, 169. There is no evidence in the record to support Capital's contention that there was mutual error as to the dimensions of the radius wall panels. We find that a reasonable factual basis exists in the record to support the trial court's finding that the radius panel dimensions were determinable from the pre-bid drawings and that the trial court was not clearly wrong. We find no merit in Capital's assignment of error that mutual error vitiated consent or in its claim that the trial court erred in failing to find that Capital was entitled to rescission of the contract.
We also find no merit to Capital's contention that it was entitled to an adverse presumption that the other panel bids Quality received during the prebidding process would have shown that Quality knew or should have known that Capital's bid was based on error. Pretermitting whether or not Capital proved that it was entitled to such a presumption and whether Capital proved that the error concerned a cause without which the obligation would not have been incurred, we find that any such error would only be attributable to Capital, as unilateral error which does not vitiate consent if the reason for the error was the complaining party's own inexcusable neglect in discovery of the error. Degravelles v. Hampton, 94-0819 (La. App. 1st Cir. 3/3/95), 652 So. 2d 647, 649, writ denied, 95-0826 (La. 5/5/95), 654 So. 2d 332; see also LSA-C.C. arts. 1948, 1949 and 1950. The testimony of Connell, Melancon and Nail supports the finding that Capital's error was neither reasonable nor excusable. As such, we find no merit to this assignment of error.

Third and Fourth Assignments of Error
Capital contends that the trial court erred in finding that Quality was justified in terminating both contracts, when the shop drawing delays were caused by Quality's failure to provide the information Capital needed to submit complete shop drawings for the panel job. Noting that the contracts did not fix a term for performance, Capital contends that it had a reasonable time to perform under LSA-C.C. art. 1778, and that the trial court erred in failing to find that Capital was in the process of performing within a reasonable time when Quality terminated both contracts. Alternatively, Capital argues that even if the panel shop drawings were untimely, the trial court erred in finding that Quality was justified in terminating the curtain wall system contract, as Capital had submitted complete shop drawings for the curtain wall system job, which the Corps had approved, at the time Quality terminated both contracts.
If no time for performance is stated in a contract, a reasonable time is to be determined from the circumstances surrounding the formation of the contract and how the parties themselves look upon the time element. Owens v. Robinson, 329 So. 2d 766, 767 (La. App. 2nd Cir. 1976); see also Robison v. Jarreau, 452 So. 2d 1271, 1274 (La. App. 1st Cir. 1984) and River Cities Construction Company, Inc. v. Barnard & Burk, Inc., 444 So. 2d 1260, 1265 (La. App. 1st Cir. 1983), writs denied, 446 So. 2d 1223, 1226 (La. 1984).
As to the dates Capital submitted complete shop drawings to the two jobs, the record reflects that Capital submitted complete curtain wall system shop drawings to Quality in late August 2004, which was five months after Quality issued the notice to proceed with the curtain wall system job. The evidence also shows that Quality was initially informed that the Corps did not approve the curtain wall shop drawings. As set forth in the record, Ace also determined, and informed Quality, that Capital's curtain wall shop drawing submissions did not meet one of the specifications on the pre-bid drawings. The testimony of John DeVorss, Capital's drafting supervisor on the Project jobs, establishes that the only drawings Capital submitted for the panel job were preliminary shop drawings on July 19, 2004. DeVorss conceded that Capital never completed the panel shop drawings.
In determining what would be a reasonable time period for submitting shop drawings, Quality's president, Melancon, testified that 30 days was reasonable. Capital's president, Cox, disagreed with Melancon and testified that in his view, Capital's actions concerning the shop drawings were reasonable. He explained that the time period required for creating shop drawings depends on the complexity of the job and the time it takes to get information responses back from the architect and the general contractor. Although Cox did not testify as to what date would have been reasonable for the submissions on the panel job, he conceded upon questioning that he did not believe it would take seven months to create shop drawings on this job. Likewise, Capital's own drafting supervisor, DeVorss, testified that it would take about one month to six weeks to create shop drawings for the panel job, and three to four weeks to create shop drawings for the curtain wall system job.
The record also shows evidence of unreasonable delay by Capital, as Capital refused to release panel shop drawings unless Quality agreed to increase the price on the panel purchase order on two separate occasions. On September 10, 2004, Nail sent Cox a letter informing him that the delay in submitting the panel shop drawings was very problematic. On September 13, 2004, Cox responded to Nail's concerns and informed Nail that Hamm would be meeting with the Project architect to clarify the issue of the dimensions of panels for the radius wall. Cox assured Nail that after the meeting, Capital would complete the panel submissions. However, in the same e-mail, Cox informed Nail that the panel price on the panel purchase order was $1,000.00 less than Capital's bid price, and that he would not release the shop drawings until Quality issued a revised purchase order for Capital's bid price of $91,300.00. That same day, Nail reissued the panel purchase order for $91,300.00 and requested that Capital forward the panel shop drawings to him.
Although Capital represented that it would release the panel shop drawings after it received the revised panel purchase order for $91,300.00, on October 1, 2004, Hamm, instead informed Nail that Capital would require an additional $15,000.00 for the panel job, because the panels on the radius wall would have to be different shapes and dimensions. Hamm informed Nail that Capital would not release the shop drawings until three to four days after Capital received a purchase order for the additional $15,000.00 amount. After Quality denied the request for the $15,000.00 increase, Hamm informed Nail that Capital had stopped working on the Project until the change order amount was received.
DeVorss testified that the issues concerning the radius panel dimensions only affected the layout of the panels on the curved portion of the radius wall. DeVorss stated that he could lay out eighty-five to ninety percent of the panels for the job, even without having resolution on the radius wall panel issues, because those panels were on the Project's flat walls. DeVorss testified that after he and Hamm met with the Project architect, he "pretty much" had the shop drawings complete and ready to go, and he was a week or two away from being able to complete the panel shop drawings. However, DeVorss testified, the panel shop drawings were never completed.
Based on our review of the record, we find that the evidence and the testimony establish Capital took five months to submit curtain wall system shop drawings, which DeVorss testified could have been created in three to four weeks. Moreover, we find that the evidence and the testimony establish that Capital never completed panel shop drawings, even though Nail reissued the panel purchase order in accordance with Capital's demand for original bid price of $91,300.00. DeVorss admitted that Capital could complete at least eighty-five percent of the panel layouts without resolution of the radius wall panel dimension issues, and that he was only one to two weeks away from completing the panel submissions after the September 13, 2004 meeting with the Project architect. However, Capital never submitted the panel shop drawings to Quality. Accordingly, we find that there is a reasonable factual basis in the record to support the trial court's finding that Quality was justified in terminating both contracts, and that the trial court was not clearly wrong.

Fifth and Sixth Assignments of Error
In its last assignments of error, Capital argues that the damage award is excessive and should be reduced because: (1) the trial court calculated Quality's damages based on the difference between Capital's and Ace's contract prices; (2) Ace's bids included work that was not included in Capital's contracts; and (3) the trial court erroneously failed to find that Quality did not mitigate its damages when Quality solicited only one, unreasonably high, bid to cover the Capital contracts.
An obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure to perform results from nonperformance, defective performance, or delay in performance. LSA-C.C. art. 1994. The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Hager v. State Department of Transportation and Development, XXXX-XXXX (La. App. 1st Cir. 1/16/08), 978 So. 2d 454, 474, writ denied, XXXX-XXXX, XXXX-XXXX (La. 4/18/08), 978 So. 2d 349. The discretion vested in the trier of fact in fixing general damages has consistently been described as "great, and even vast, so that an appellate court should rarely disturb an award of general damages." Id. (citation omitted).
In reviewing the trial court's findings of fact, we find that, in calculating that Quality was owed $54,870.00 in damages, the trial court took into consideration the difference in prices on Capital's and Ace's agreement with Quality ($76,700.00 on the panel job and $100.00 on the curtain wall system job), Quality's request for a lesser amount, $66,700.00, and Capital's calculations for the cost and expenses it incurred on the panel job ($7,380.00) and the curtain wall system job ($4,450.00). We find that the trial court's determination of damages and the credit awarded to Capital for the work it completed on both jobs is supported by the joint exhibits introduced into evidence at the trial, the testimony of Melancon and Cox, and the record as a whole. While Melancon testified that there were materials included in the price of Ace's panel job that were not included in Capital's bid, there is no evidence or testimony showing that the amount of these extra items exceeded the $10,000.00 figure used by the trial court in considering the difference between the price on the face of the two contracts. In addition, the joint exhibits and Melancon's testimony establish that Ace completed the work on both jobs and was paid for the panel and curtain wall system jobs. Based on our review of the record, we find that the trial court did not abuse its discretion in awarding Quality $54,870.00 in damages. We also find that there is no evidence to support Capital's contention that Quality acted unreasonably in taking only one bid in its efforts to find a substitute contractor to replace Capital or that Ace's bid was unreasonable. Thus, we find no merit to these assignments of error.

CONCLUSION
For the foregoing reasons, we affirm the trial court's judgment. All costs of this appeal are assigned to the appellant, Capital Glass Company, Inc.
AFFIRMED.
NOTES
[1] The record indicates that the submission process was designed to ensure that the subcontractor understood the architectural drawings and specifications for the Project and to show the Project architect and general contractor exactly how the subcontractor planned to do the work.