991 So.2d 479 (2008)
Clinton MACK and Effie Mack
v.
Dorothy WILEY and American National Property and Casualty Company.
No. 2007 CA 2344.
Court of Appeal of Louisiana, First Circuit.
May 2, 2008.
*483 Vincent L. Bowers, New Orleans, LA, for Plaintiffs-Appellants, Clinton and Effie Mack.
Arthur H. Andrews, Baton Rouge, LA, for Defendants-Appellees, Dorothy Wiley and ANPAC Louisiana Insurance Company.
Before CARTER, C.J., PETTIGREW, and WELCH, JJ.
CARTER, C.J.
Plaintiffs-appellants, Clinton and Effie Mack (the Macks), appeal a trial court judgment on a jury verdict in this personal injury case. Defendants-appellees, Dorothy Wiley and ANPAC Louisiana Insurance Company (ANPAC), answered the appeal.[1] For the following reasons, we vacate one of the judgments in the record, amend the trial court judgment reflecting the jury verdict, and affirm as amended.

FACTS
This action arises from a motor vehicle accident that occurred on May 20, 2004, in East Baton Rouge Parish, Louisiana. Mr. Mack was driving his automobile westbound in the curbside lane on Louisiana Highway 64 near a cross street in Zachary that was controlled by a signal light and which allowed access to stores on both sides of the highway. Mr. Mack had a green light as he approached the cross street. At the same time, Ms. Wiley was driving her pickup truck in an easterly direction at the same location. Ms. Wiley also had a green light, but she had stopped in the inside eastbound lane of travel to wait for the traffic to clear so that she could make a left-turn at the cross street. After waiting for an opportunity to turn, Ms. Wiley began her left-turn, but then had to stop again because a red pickup truck suddenly darted in front of her path. The red pickup truck had been sitting and waiting to make a left turn on the opposite side of the highway, facing Ms. Wiley, when the driver apparently decided to go straight through the intersection instead of making the turn. After the red pickup truck cleared from Ms. Wiley's path, she immediately saw Mr. Mack's automobile fast approaching the intersection. Ms. Wiley hesitated briefly and then attempted to finish her left-turn across the highway, believing that Mr. Mack's vehicle would either change lanes or stop. Unfortunately, Mr. Mack's automobile struck the right side of the back rear tire area of Ms. Wiley's pickup truck before Ms. Wiley cleared Mr. Mack's lane of travel. Mr. Mack denied seeing Ms. Wiley's pickup truck until she was directly in front of his vehicle in his lane of travel and it was too late to avoid the collision. Mr. Mack also denied seeing the red pickup truck and he estimated his speed was approximately 40 miles-per-hour in the 45 mile-per-hour *484 zone. The force of the collision knocked the back rear tire off of Ms. Wiley's pickup truck and forced her truck to collide with another vehicle that was stopped at the red light exiting the shopping area that Ms. Wiley was attempting to enter.[2]
The collision caused Mr. Mack's left knee to strike the dashboard of his vehicle. Additionally, Mr. Mack experienced the onset of back and neck pain and he was transported in an ambulance to the hospital emergency room, secured on a backboard with a cervical collar. Ms. Mack was called and she met her husband at the hospital. While in the emergency room, the 71-year-old Mr. Mack was x-rayed, examined, and prescribed pain medication for muscle strain and contusions before being discharged with instructions to rest at home for 2-3 days. He was advised to return for follow up care if his pain did not resolve. Four days later, Mr. Mack went to his family physician, Dr. Bradford J. Smith, because of persistent pain in his left knee. Dr. Smith ordered an x-ray of Mr. Mack's knee and noted a bruise on the knee as well as evidence of degenerative joint disease that was revealed by the x-ray. Because Mr. Mack had never complained of left knee pain before, Dr. Smith referred Mr. Mack to an orthopedic surgeon, Dr. A. Brent Bankston, for further evaluation of the knee injury. Additionally, Mr. Mack sought treatment for two months with a chiropractor, Dr. Michael J. Goff, for his neck and back strain that eventually resolved.
Dr. Bankston first saw Mr. Mack on June 4, 2004, when Mr. Mack described the accident and stated that he had only experienced occasional soreness and stiffness in his left knee before the accident and that he had never sought treatment for left knee pain prior to the accident. Dr. Bankston diagnosed Mr. Mack with an aggravation of a pre-existing degenerative arthritic condition in all three compartments of his left knee joint, as well as a deep knee bruise. Dr. Bankston recommended conservative treatment combining anti-inflammatory medication, knee exercises, and time for the pain to resolve back to Mr. Mack's pre-accident level. Dr. Bankston advised Mr. Mack that he may eventually need injections or a total knee replacement because of the significant arthritic condition in his knee. Mr. Mack was familiar with knee replacement surgery because he had his right knee successfully replaced fourteen years earlier in 1990. Approximately one month after his initial visit with Dr. Bankston and six weeks after the accident, on July 6, 2004, Mr. Mack returned to Dr. Bankston and requested that the previously recommended knee replacement surgery be performed as soon as possible, because he was in tremendous pain. Dr. Bankston agreed that the surgery was medically necessary, and the surgery was scheduled for July 21, 2004.
After the surgery, Mr. Mack remained hospitalized for three days and he then stayed in a rehabilitation facility for ten more days before returning home. Mr. Mack continued outpatient physical therapy for three months until he was discharged on October 25, 2004. Throughout the entire time of Mr. Mack's accident and convalescence, he was not able to work at his full-time job as a school bus driver with First Student, Inc. During the following summer, in 2005, Mr. Mack attempted to return to work, but could not pass the physical required of all school bus drivers.[3] He sought additional treatment from another *485 orthopedic surgeon, Dr. Francis Allen Johnston, on May 31, 2005, for some residual left knee pain. Dr. Johnston ordered x-rays that revealed a good alignment in Mr. Mack's knee and he opined that Mr. Mack's mild pain was normal progress for his stage of recovery almost one year after the knee replacement surgery. Dr. Johnston saw Mr. Mack again eight months later, on January 30, 2006, and Mr. Mack was doing much better with a 20-25% permanent impairment of his left knee. Shortly thereafter, Mr. Mack was again driving a school bus, but for a different employer and only part time.
Mr. Mack and his wife filed suit for damages against Ms. Wiley and her liability insurer, ANPAC, on September 9, 2004. Following a jury trial on May 22-24, 2007, the jury returned a verdict in favor of the Macks, awarding Mr. Mack $32,000.00 for past medical expenses, $7,500.00 for pain and suffering, $7,500.00 for mental anguish, and $7,500.00 for lost wages, and awarding Ms. Mack $7,500.00 for loss of consortium. The jury allocated fault for the accident as follows: 70% to Ms. Wiley, 20% to the unknown driver of the red pickup truck, and 10% to Mr. Mack. Thus, the trial court rendered a final judgment on July 27, 2007, reflecting the jury's verdict and reducing the amounts awarded in accordance with the jury's allocation of fault for the total sum of $38,150.00 to Mr. Mack and $5,250.00 to Ms. Mack, with the costs to be determined by a later rule. The Macks now devolutively appeal, contesting the jury's allocation of fault, the past medical expense award, and Mr. Mack's general damages award. Ms. Wiley and ANPAC answered the appeal, also contesting the jury's allocation of fault and past medical expense award, as well as arguing that the trial court incorrectly assessed costs.[4]

THE JUDGMENT
Initially, we must address a procedural issue regarding multiple judgments contained in the record. The record before us contains two judgments on the issues presented at this jury trial. The first judgment on the merits was rendered on July 27, 2007 and the second judgment on the merits was rendered on August 29, 2007. Both judgments reflect the same dollar amounts awarded to the Macks, but the second judgment is much more detailed in its recitation of the jury's verdict, and it significantly differs in the assessment of costs. The first judgment orders that the issue of court costs "will be determined by rule" and the second judgment orders Ms. Wiley and ANPAC to pay "all costs." The record also contains a third judgment that was rendered on October 9, 2007, taxing Ms. Wiley and ANPAC with 70% of the total costs after a hearing was held on a motion to tax costs.
It is well settled under our jurisprudence that a judgment that has been signed cannot be altered, amended, or revised by the trial court, except in the manner provided by law. Oreman v. Oreman, 05-955 (La.App. 5 Cir. 3/31/06), 926 So.2d 709, 712, writ denied, 06-1130 *486 (La.9/1/06), 936 So.2d 206. Louisiana Code of Civil Procedure article 1951 limits the amendment of judgments to the correction of errors in calculation and alteration of phraseology, but not the substance. Courts have uniformly held substantive amendments to judgments made without recourse to the proper procedures, i.e. by way of a timely motion for a new trial or by appeal, to be absolute nullities. See Id.; McGee v. Wilkinson, 03-1178 (La.App. 1 Cir. 4/2/04), 878 So.2d 552, 554-555.
It is clear from a reading of the two judgments on the merits that the second judgment contains a substantive change in the assessment of costs. The first judgment states that the costs are to be determined after a future hearing, and the second judgment orders Ms. Wiley and ANPAC to pay all costs. When a trial court substantively amends a judgment without recourse to the proper procedure, the amended judgment is an absolute nullity. Frisard v. Autin, 98-2637 (La.App. 1 Cir. 12/28/99), 747 So.2d 813, 819, writ denied, 00-0126 (La.3/17/00), 756 So.2d 1145. Louisiana jurisprudence further provides that when a trial court signs a judgment and then signs another, the second judgment is an absolute nullity and without legal effect. Oreman, 926 So.2d at 712.
The first judgment dated July 27, 2007, was signed by the trial court and appears in all respects to be a valid final judgment from which this appeal was taken. It is unclear from the record why the trial court then signed a second judgment in the matter, because the record does not contain a motion to alter the judgment either by the trial court or one of the parties. Nevertheless, the second judgment signed on August 29, 2007, clearly alters the substance of the first judgment in violation of the prohibition contained in LSA-C.C.P. art. 1951. When this court notices such an absolute nullity, we must vacate on our own motion. See Ducombs v. Nobel Ins. Co., 03-1704 (La.App. 4 Cir. 7/21/04), 884 So.2d 596, 602. Therefore, we find that the second judgment is null and void, and we hereby vacate the August 29, 2007 judgment.
The appeal before us specifically addresses the first judgment dated July 27, 2007. In their answer to the Macks' appeal, Ms. Wiley and ANPAC make reference to an error by the trial court in the assessment of costs. However, we conclude that the issue of court costs is not properly before this court, because the judgment that fixed costs and taxed them against Ms. Wiley and ANPAC is a final judgment that was not appealed. See Hoyt v. State Farm Mut. Auto. Ins. Co., 623 So.2d 651, 663-664 (La.App. 1 Cir.), writ denied, 629 So.2d 1179 (La.1993). The costs were addressed in the third judgment of record dated October 9, 2007. This "costs" judgment was a separately appealable judgment, rendered after an additional hearing that followed the judgment on the merits. See Little v. Pou, 42,872 (La.App. 2 Cir. 1/30/08), 975 So.2d 666, 681. Ms. Wiley and ANPAC have not appealed the costs judgment; therefore, we will not consider their assignment of error regarding costs that they raised in their answer to this appeal.

FAULT
We turn now to the assignments of error regarding the jury's allocation of fault. The Macks argue that the jury erred in not finding that Ms. Wiley was 100% at fault for the accident and in assigning 10% fault to Mr. Mack and 20% fault to the driver of the red pickup truck. Conversely, Ms. Wiley and ANPAC contend that the jury erred in assessing only 10% fault to Mr. Mack, because the appropriate percentage of fault for Mr. Mack *487 should have been 100%. For the following reasons, we disagree that the jury erred in their fault assessments.
The Louisiana Supreme Court, in Duncan v. Kansas City Southern Railway Co., 00-0066 (La.10/30/00), 773 So.2d 670, 680-681, cert. dismissed, 532 U.S. 992, 121 S.Ct. 1651, 149 L.Ed.2d 508 (2001), set forth the standard for reviewing comparative fault determinations as follows:
This Court has previously addressed the allocation of fault and the standard of review to be applied by appellate courts reviewing such determinations. Finding the same considerations applicable to the fault allocation process as are applied in quantum assessments, we concluded the `trier of fact is owed some deference in allocation fault' since the finding of percentages of fault is also a factual determination. Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607, 609, 610. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Id.

Therefore, a trier of fact's allocation of fault is subject to the manifestly erroneous or clearly wrong standard of review. Hebert v. Rapides Parish Police Jury, 06-2001 (La.1/16/08), 974 So.2d 635, 654. The trier of fact's findings of fact will not be disturbed unless they are manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.4/12/93). If an appellate court finds a "clearly wrong" apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point, respectively, which is reasonably within the fact finder's discretion. Hebert, 974 So.2d at 654-655.
The Louisiana Supreme Court addressed what factors to consider when reviewing an allocation of fault in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985). Various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Id. These factors also guide an appellate court's determination as to the highest or lowest percentage of fault that could reasonably be assessed to each party. Clement, 666 So.2d at 611. We must be mindful that the allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and that any allocation by the factfinder within that range cannot be "clearly wrong." Hebert, 974 So.2d at 655; Clement, 666 So.2d at 611.
The Macks argue that the law and facts support an assessment of 100% fault to Ms. Wiley, a left-turning motorist who entered Mr. Mack's lane of travel. They argue that Mr. Mack was the favored motorist because he was proceeding through the intersection on a green light. It is correct that Mr. Mack is afforded the benefit of a presumption of Ms. Wiley's negligence since Ms. Wiley was executing a left-hand turn, and as an oncoming driver, Mr. Mack had a right to assume that Ms. Wiley would obey the law in allowing him to continue in his proper lane of travel and to yield to his right-of-way. See Slagel v. Roberson, 37,791 (La.App. 2 Cir. 11/18/03), 858 So.2d 1288, 1290-1291, writ denied, 03-3508 (La.3/12/04), 869 So.2d 824. However, a favored motorist can still be assessed with comparative fault if his substandard conduct contributed to the cause of the accident. Cyrus v. U.S. *488 Agencies Ins. Co., 41,826 (La.App. 2 Cir. 3/14/07), 954 So.2d 261, 268.
Mr. Mack testified that he never saw Ms. Wiley's pickup truck until it was directly in front of him in his lane of travel moments before impact. Mr. Mack also testified that he never saw the red pickup truck that pulled out in front of Ms. Wiley that had caused her to stop midway through her left-turn maneuver. From this testimony, the jury could have easily determined that Mr. Mack was inattentive in that he failed to see what he should have seen so that he could have taken evasive action before the impact. See Hayes v. Covey, 06-382 (La.App. 3 Cir. 9/27/06), 939 So.2d 630, 632. A driver has a duty to proceed cautiously when entering an intersection, even when he does have a green light. See Whigham v. Boyd, 97-0693 (La.App. 4 Cir. 10/1/97), 700 So.2d 1163, 1167, writ denied, 97-2740 (La.1/16/98), 706 So.2d 979; Higgins v. Johnson, 349 So.2d 918, 926 (La.App. 1 Cir.), writs denied, 351 So.2d 161, 162 (La. 1977). Since Mr. Mack did not see Ms. Wiley's vehicle and the red pickup truck that were clearly in sight, we are convinced that he failed to exercise an appropriate degree of care before proceeding through the intersection.
Clearly, Ms. Wiley's action of continuing to proceed with her left-turn after she saw Mr. Mack's vehicle approaching the intersection was also negligence. Ms. Wiley's explanation that she believed Mr. Mack would either change lanes or stop, reflects poor judgment in not exercising the degree of care necessary to complete her left-hand turn across the favored roadway. The law considers a left-turn to be the most dangerous maneuver a motorist may execute, and a driver attempting a left-turn has a duty to make certain the turn can be completed safely. Reed v. State Farm Mutual Automobile Ins. Co., 05-1532 (La.App. 3 Cir. 5/3/06), 929 So.2d 871, 875, writ denied, 06-2000 (La.11/3/06), 940 So.2d 672. The scope of this duty extends to vehicles approaching from the opposite direction, such as Mr. Mack's vehicle. Id.
Further, Ms. Wiley's testimony about the sudden movement of the red pickup truck into her path after she began her left-turn supports the jury's finding that the driver of the red pickup truck contributed to the cause of this accident. Ms. Wiley testified that she waited for traffic to clear before she began her turn and she saw that the red pickup truck was stopped, presumably waiting to turn in the opposite direction. When the red pickup truck suddenly darted in front of Ms. Wiley's path instead of turning, she was able to stop for it to pass. By that time, however, Ms. Wiley had lost her opportunity to safely continue across the road without oncoming vehicles posing a threat. Obviously, had the red pickup truck not suddenly changed its course after Ms. Wiley began her left-turn, which caused her to stop, Ms. Wiley would have safely completed her left-turn. As it was, Ms. Wiley almost completed the turn before she was struck by Mr. Mack's vehicle. Thus, we conclude that the action of the red pickup truck driver also contributed to this accident.
In summary, the jury reasonably found that all three drivers' substandard conduct caused this accident. Under the circumstances, the jury's finding that Mr. Mack was 10% at fault, Ms. Wiley was 70% at fault, and the driver of the red pickup truck was 20% at fault in causing the accident is supported by the record. Therefore, we find no manifest error in the jury's allocation of fault.

PAST MEDICAL EXPENSES
The Macks next challenge the jury's award for past medical expenses. *489 They contend that the jury ignored the uncontested documented evidence of Mr. Mack's medical expenses totaling $37,674.15 when it arbitrarily awarded $32,000.00 for past medical expenses. Ms. Wiley and ANPAC counter that the jury refused to award all of the medical expenses because Mr. Mack was not seriously injured and only sustained a bruised knee, and therefore, the medical expense award should be even less. We find no merit to Ms. Wiley and ANPAC's explanation.
A plaintiff may ordinarily recover reasonable medical expenses that he incurs as a result of an injury. Rhodes v. State through Dept. of Transp. and Development, 94-1758 (La.App. 1 Cir. 12/20/96), 684 So.2d 1134, 1148, writ not considered, 97-0242 (La.2/7/97), 688 So.2d 487. Past medical expenses are special damages that are capable of being determined with reasonable mathematical certainty and, as such, they must be proven by the person seeking them by a preponderance of the evidence. Venissat v. St. Paul Fire & Marine Ins. Co., 06-987 (La.App. 3 Cir. 8/15/07), 968 So.2d 1063, 1071. The medical evidence must show the existence of the claimed injuries and a causal connection between the injuries and the accident. Wright v. Gen. Aviation Co., 04-772 (La. App. 5 Cir. 11/30/04), 889 So.2d 1115, 1120; Rhodes, 684 So.2d at 1148. When claims for the accrued medical expenses are supported by medical bills, these expenses should be awarded unless there is contradictory evidence or reasonable suspicion that the bills are unrelated to the accident. Venissat, 968 So.2d at 1071. A jury manifestly errs if the victim has proven his medical expenses by a preponderance of the evidence, and it fails to award the full amount of the medical expenses proven. Id. The tortfeasor is required to pay for medical treatment of the victim, even over-treatment or unnecessary treatment, unless such treatment was incurred by the victim in bad faith. Gunn v. Robertson, 01-347 (La.App. 5 Cir. 11/14/01), 801 So.2d 555, 564, writs denied, 02-170, 02-176 (La.3/22/02), 811 So.2d 942.
In this case, the Macks introduced evidence to support past medical expenses of $37,674.15 for treatment and surgery incurred after the accident. Ms. Wiley and ANPAC do not dispute the amount of the medical expenses claimed; rather, they argue that the medical expenses are excessive because Mr. Mack's surgery was related to a pre-existing degenerative arthritic knee condition rather than the bruised knee he sustained in the accident. Ultimately, however, the jury awarded $32,000.00 for medical expenses, an amount that accounts for the surgery that they found to be related to Mr. Mack's aggravation of his pre-existing condition in the accident. In a situation where a pre-existing condition is aggravated in an accident, the tortfeasor is required to compensate the victim for the full extent of the aggravation injury. Venissat, 968 So.2d at 1073.
We can only speculate as to the jury's thoughts in not awarding the full amount of Mr. Mack's uncontested and documented medical expenses. We find, however, that the jury's award for past medical expenses for an amount less than what was supported by the evidence was error. Therefore, we amend the jury's award of past medical expenses and render an award of $37,674.15, commensurate with the total expenses established in the record.

GENERAL DAMAGES
Finally, we address the Macks' assignment of error claiming that the jury abused its discretion by awarding inadequate general damages for Mr. Mack's *490 pain and suffering in the amount of $7,500.00, and for Mr. Mack's mental anguish in the amount of $7,500.00.[5] Our jurisprudence has consistently held that in the assessment of general damages, much discretion is left to the jury, and upon appellate review such awards will be disturbed only when there has been a clear abuse of that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La. 1976). The discretion vested in the jury is great, even "vast," so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Wainwright v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70, 74; Youn, 623 So.2d at 1261. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Youn, 623 So.2d at 1260. Reasonable persons frequently disagree about the measure of general damages in a particular case. Youn, 623 So.2d at 1261. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Id. If the appellate court determines that an abuse of discretion has been committed, it is then appropriate to resort to a review of prior awards, to determine the appropriate modification of the award. Prior awards under similar circumstances serve only as a general guide. In such review, the test is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. Id.; Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993).
We have carefully reviewed the record in this case, and we find that the total $15,000.00 award for pain, suffering, and mental anguish is below that which a reasonable trier of fact could assess. The testimony at trial showed that Mr. Mack was a 71-year-old bus driver who had not missed work for any reason during the school year prior to the accident that occurred on the last day of school in 2004. Prior to the accident, Mr. Mack had never sought medical treatment for pain in his left knee, although he had experienced occasional soreness and stiffness at times. The uncontroverted medical testimony established that Mr. Mack had a pre-existing degenerative arthritic condition in his left knee that was asymptomatic prior to the accident. Immediately after his left knee hit the dashboard in his vehicle at the time of the accident, Mr. Mack's knee pain began and did not resolve until he recovered from knee replacement surgery. Mr. Mack's treating orthopedic surgeon, Dr. Bankston, testified that the trauma of the accident triggered the pain in Mr. Mack's knee that led to the necessity of a total knee replacement surgery. A second orthopedic surgeon, Dr. Johnston, also opined that the surgery was warranted because of Mr. Mack's pain and symptoms resulting from the aggravation *491 of his underlying arthritic condition. Dr. Johnston testified that although six weeks after the accident may have been a little soon to schedule surgery, when the pain is severe enough and a degenerative condition is present, surgery is warranted. There is no medical evidence to the contrary.
Mr. and Mrs. Mack testified about the length of time Mr. Mack stayed in the hospital (three days) and in a rehabilitation facility (ten days) after the surgery, and about how difficult, limiting, and painful the recovery process was. Mr. Mack continued to be in physical therapy until the end of October, five months after the date of the accident. He continued to experience pain in his knee after the surgery and sought additional medical treatment for the pain twice during the eighteen-month time period following the surgery and before he returned to work. Additionally, the medical testimony revealed that Mr. Mack has a permanent disability of 20-25% in his left knee because of the surgery.
It is a well-settled rule of law that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortuous conduct. Gunn, 801 So.2d at 563. When the tortfeasor's conduct aggravates a pre-existing condition, the tortfeasor must compensate the victim for the full extent of the aggravation. Id. Furthermore, there is a legal presumption that a medical condition producing the disability is presumed to have resulted from the accident if, before the accident the injured person was in good health, but shortly after the accident the disabling condition manifested itself. Housley v. Cerise, 579 So.2d 973, 980 (La.1991).
In this case, the testimony established that Mr. Mack had no real difficulty with his left knee prior to the accident. He was able to perform his job and help with work around the house. After the accident, he had constant left knee pain that only resolved with surgical intervention. His activities were severely limited, and he was completely unable to work due to his knee pain. Accordingly, we find that the accident caused Mr. Mack's degenerative joint condition in his left knee to become symptomatic, creating the need for total knee replacement surgery.
Considering all of this, we have conducted a review of prior awards for pain, suffering, and mental anguish in cases where asymptomatic arthritic knee conditions became symptomatic necessitating total knee replacement surgeries, and have found that general damages in similar cases ranged from $65,000.00 to $125,000.00. Most cases with smaller awards in the $14,000.00 to $15,000.00 range involved much less intrusive arthroscopic procedures and shorter recovery periods, while cases with the higher award range of $100,000.00 to $125,000.00 often involved more than one surgical procedure, multiple traumatic injuries, and longer hospital stays. See Henry v. Williams, 39,318 (La. App. 2 Cir. 1/26/05), 892 So.2d 765, 771-772, writ denied, 05-0472 (La.4/22/05), 899 So.2d 576, for a helpful outline of pertinent cases. Furthermore, many cases with awards ranging from $27,200.00 to $70,000.00 involved scenarios where total knee replacement surgeries were likely in the future, but had not yet occurred. See Ducombs, 884 So.2d at 601-602; Moody v. State Farm Mutual Auto Ins. Co., 03-1594 (La.App. 3 Cir. 5/12/04), 872 So.2d 630, 636-637, writs denied, 04-1465, 04-1386 (La.11/8/04), 885 So.2d 1137; and Orgeron v. Prescott, 93-926 (La.App. 5 Cir. 4/14/94), 636 So.2d 1033, 1041, writ denied, 94-1895 (La.10/28/94), 644 So.2d 654.
Based on our review, we find that the lowest point that is reasonably within the *492 discretion of the jury for Mr. Mack's general damage award is $65,000.00. Therefore, we amend the prior award of $15,000.00 for pain, suffering, and mental anguish and raise it to the lowest reasonable amount of $65,000.00. The quantum of all other claims comprising the total damage award ($7,500.00 for Mr. Mack's past lost wages and $7,500.00 for Ms. Mack's loss of consortium) are affirmed, with the exception of the award of past medical expenses, which is amended and rendered in the amount of $37,674.15.

CONCLUSION
For the foregoing reasons, we vacate the trial court judgment dated August 29, 2007, and we affirm the July 27, 2007 judgment of the trial court reflecting the jury verdict, but we amend the quantum awarding to Mr. Mack past medical expenses in the amount of $37,674.15, and general damages for past and future pain, suffering, and mental anguish in the amount of $65,000.00. The jury's awards of $7,500.00 for past lost wages to Mr. Mack and $7,500.00 for loss of consortium to Ms. Mack are affirmed.
This award is subject to the 70% fault attributed by the jury to Ms. Wiley and ANPAC, resulting in a total award in favor of Mr. Mack and against Ms. Wiley and ANPAC in the full sum of $77,121.91 and a total award in favor of Ms. Mack and against Ms. Wiley and ANPAC in the full sum of $5,250.00.
All costs of this appeal are assessed to defendants-appellees, Dorothy Wiley and ANPAC Louisiana Insurance Company.
JUDGMENT OF AUGUST 29, 2007, VACATED; JUDGMENT OF JULY 27, 2007, AFFIRMED AS AMENDED, AND RENDERED.
NOTES
[1] The Mack's petition incorrectly named American National Property and Casualty Company as Dorothy Wiley's insurer; however, ANPAC answered the petition, accurately reflecting the true and correct name of Dorothy Wiley's insurance carrier.
[2] The driver of the third vehicle involved in the collision is not a party to this lawsuit.
[3] Mr. Mack also suffered an unrelated mild heart attack in January 2005, which delayed his return to work.
[4] We note that Ms. Wiley and ANPAC also suspensively appealed the July 27, 2007 judgment, but they later moved to "withdraw" their appeal without furnishing the appeal bond, which the trial court allowed on September 19, 2007, Ms. Wiley and ANPAC filed an answer to the Macks' appeal on November 29, 2007, Because the record does not reflect that Ms. Wiley and ANPAC ever filed the suspensive appeal bond, their appeal of the July 27, 2007 judgment was not perfected and the trial court did not lose its jurisdiction to allow the withdrawal of their appeal. See Goodwin v. Tilley, 01-1280 (La.App. 3 Cir. 10/31/01), 799 So.2d 768, 771-772; Levet v. Louisiana Real Estate Com'n, 97-1621 (La. App. 1 Cir. 9/25/98), 721 So.2d 928, 929.
[5] The jury awarded Mr. Mack $7,500.00 for his past and future pain and suffering and $7,500.00 for his past and future mental anguish, for a total general damage award of $15,000.00. The $7,500.00 award for Mr. Mack's past lost wages and $7,500.00 for Ms. Mack's loss of consortium claim is not contested.