Judge Rosemary Ledet
JjjThis is a personal injury case. The plaintiff, Leon Waters, filed suit for damages for injuries sustained on a Regional Transit Authority (“RTA”) bus when the bus came to an abrupt stop to avoid hitting a preceding vehicle. Following a bench trial, the trial court awarded $695,544.27 in damages in favor of Mr. Waters and against RTA; Veolia Transportation Services, Inc. (“Veolia”); and its insurer, Old Republic Insurance Company (“Old Republic”) (collectively the “Defendants”). The trial court also found the preceding vehicle thirty percent (30%) at fault and thus reduced the damages award to $486,881.00.[1] Both Mr. Waters and Defendants appeal. For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
On Friday, October 22, 2010 at 10:02 p.m., Mr. Waters boarded a RTA bus in front of the Whole Foods Market on Magazine Street in New Orleans, Louisiana.[2] *41 After entering the bus, Mr. Waters proceeded to the priority seating ^section[3] and sat down in a priority seat located behind the bus driver, Roy Oliver.[4] The bus, which was headed towards the Downtown area of New Orleans, was traveling behind a black truck.
As the bus approached the intersection at Magazine Street and Bordeaux Street, the black truck applied its brakes and made a left turn onto Bordeaux Street. Mr. Oliver applied the brakes to avoid colliding with the truck. At that time, Mr. Waters was ejected from his seat and landed on his right side on the floor near the driver and the door of the bus. Mr. Oliver, as well as two other passengers, went to Mr. Waters’ aid. Shortly thereafter, Mr. Waters complained of shoulder pain.
After checking on Mr. Waters, Mr. Oliver reported the accident and requested an ambulance. Shawn Barnes, a Veolia supervisor, came to the scene. Both Mr. Oliver and Mr. Barnes drafted reports of the accident. Although Defendants concede that RTA buses are equipped with video recording systems, Defendants admit that they cannot produce the video of the October 22, 2010 accident.
Thereafter, Mr. Waters was transported to Touro Hospital by ambulance and treated for his injuries, which are discussed in detail elsewhere in this opinion.
IsOn October 18, 2011, Mr. Waters filed a petition for damages naming as defendants Mr. Oliver, RTA, TMSEL, and Veo-lia as defendants. In his first supplemental and amending petition for damages, Mr. Waters added Old Republic, Veolia’s insurer, as a defendant.
On May 2, 2016, a bench trial commenced. On May 4, 2016, during the Defendants’ case, the parties agreed to recess the trial until the parties had the opportunity to depose a defense witness, Marcia Kirch. On June 13, 2016, the trial resumed and concluded.
On August 29, 2016, the trial court rendered judgment in Mr. Waters’ favor and against RTA. Pointing out that the judgment failed to cast Veolia and Old Republic as liable for the damages award, Mr. Waters filed a motion for new trial. On September 12, 2016, the trial court rendered an amended judgment in Mr. Waters’ favor and against RTA, Veolia, and Old Republic.[5] The trial court also dismissed Mr. Oliver with prejudice for the failure of Mr. Waters to effect service of process. The trial court, in both the original and amended judgments, awarded the following damages:
*42 SPECIAL DAMAGES: $ 445,544.27
Past medical expenses $ 59,689.63
Future medical expenses $ 111,947,64
Past loss of earning capacity $ 112,256.00
Future loss of earning capacity $ 145,894.00
Los[s] of benefits $ 15,757.00-
GENERAL DAMAGES: $250.000.00
_k
TOTAL: $ 695,544.27*
* (Reduced by thirty percent - (30%) for the fault of the preceding driver for an adjusted total damage award of $486,880.989.)
From the trial court’s ruling, both Defendants and Mr. Waters appeal.
DISCUSSION
For ease of discussion, we divide our analysis of the issues presented into the following four categories: (i) liability; (ii) comparative fault; (iii) general damages; and (iv) special damages.[6] We separately address each-category.

Liability

Defendants contend that the trial court erred in finding them liable for Mr. Waters’ injuries. Citing Jacobs v. Reg’l Transit Auth., 03-2158 (La. App. 4 Cir. 4/14/04), 872 So.2d 571, Defendants argue that the trial court erroneously applied the stricter “common carrier” standard of negligence;[7] *43 rather, Defendants maintain | Kthat the general negligence standard applies here. Under general negligence, Defendants contend that Mr. Waters failed to prove Mr. Oliver engaged in conduct that fell below the reasonable person standard of care. Defendants further contend that Mr. Waters failed to prove that his continuing shoulder and neck injuries were caused by the accident.
This court in Jacobs, supra, explained the proper standard to be applied in RTA cases as follows:
Pursuant to La. R.S. 48:1656(23), as amended by Acts 199, No. 735, effective August 15, 1995, the RTA is not considered a. common carrier in a suit for personal injuries. As such, the RTA is not held to the previous higher standard of care that allowed a plaintiff to make out a prima facie case of liability merely by showing that he/she was a fare-paying passenger and sustained an injury, thereby shifting the burden to the RTA to exculpate itself from liability. The 1995 amendment to La. R.S. 48:1656(23) states:
Notwithstanding the provisions of any other law to the contrary, including the provisions of R.S. 45:161 et seq., the authority created herein shall not be deemed a “person” as defined in R.S. 45:162(12) or a “common carrier” as defined in R.S. 45L162(5) nor shall the authority be construed of interpreted to be such. Additionally, the authority shall not be deemed to be a common carrier, or interpreted to be such by any court of this state in a suit for personal injury or property damage.
03-2158 at p. 3, 872 So.2d at 573 (emphasis supplied). Furthermore, any entity contracted to manage or operate the RTA shall not be considered a common carrier |fiin, a suit for personal injury or property damage. La. R.S. 48:1656(23); La. R.S. 48:1653(1). Accordingly, this court has held, as Defendants contend, that absent the stricter standard of proof for common carriers, the proper standard is general negligence. Jacobs, 03-2158 at p. 3, 872 So.2d at 573; see also Manuel v. Reg’l Transit Auth., 09-1256, p. 5 (La. App. 4 Cir. 5/12/10), 36 So.3d 1131, 1133.
 The applicable standard of care in this case is thus the general negligence standard; See La, C.C. art. 2315(A) (providing that “[ejvery act-whatever of man that causes damage to another obliges him by whose fault it happened to repair it.”). In a personal injury., suit, a well-settled principle is that liability is, determined, under the duty-risk analysis.[8] Brewer v. J.B. Hunt Transport, Inc., 09-1408, p. 14 (La. 3/16/10), 35 So.3d 230, 240.
Under the manifest error standard, a trial court’s factual determinations will not be reversed unless the appellate court finds a .reasonable factual basis does not exist for the trial court’s finding and that the record establishes that the finding is clearly wrong. Holden v. Zurich Am. Ins. Co., 44,242, p. 4 (La. App. 2 Cir. 5/13/09), *44 13 So.3d 221, 224. “When findings are based on determinations regarding the credibility of a witness, the manifest error-clearly wrong standard |7demands great deference to the trier of fact’s findings.” Holden, 44,242 at pp. 4-5, 13 So.3d at 224 (citing Hanger One MLU, Inc. v. Unopened Succession of Rogers, 43,120, p. 6 (La. App. 2 Cir. 4/16/08), 981 So.2d 175, 179; Green v. Nunley, 42,343, pp. 2-3 (La. App. 2 Cir. 8/15/07), 963 So.2d 486, 489).
At trial, the parties submitted conflicting evidence regarding the speed of the bus and the proximity of the bus to the black truck. Mr. Waters testified that he frequently caught the bus at the same location in front of the Whole Foods on Magazine Street to get to his place of employment. He explained that he was employed as a room service attendant and a banquet server at the Sheraton New Orleans Hotel • (the “Sheraton”) on Canal Street. According to Mr. Waters, “Mr. Jewel” was the bus operator who normally drove the Magazine Street bus route that he rode; however, Mr. Jewel was off work on the day of the accident. Mr. Waters further testified that he typically boarded the bus at 9:50 p.m. and arrived at the Sheraton around 10:10 p.m. On the day of the accident, the bus was running late; Mr. Waters boarded the bus at 10:02 p.m. After boarding the bus, Mr. Waters felt the bus moving at a speed faster than normal to catch up,
Mr. Oliver, the bus operator on the date of the accident, testified that he has been a bus driver for about nine years. He admitted that he was “behind schedule maybe four or five minutes,” on that day; however, he denied hurrying to make up time. Instead, he testified that he was traveling at approximately 15 miles per hour (“mph”) at the time of the accident. Mr. Barnes, Mr. Oliver’s supervisor, also reported that the bus was traveling at approximately 15 mph. Inconsistently, Mr. IsOliver’s post-accident report, which he drafted about three hours after the accident, stated that Mr. Oliver was traveling at 20 mph.
Marcia Kirch, a defense witness, testified that she was a passenger on the bus at the time of the accident. She testified that the bus may have been traveling between 15 to 25 mph before it came to an abrupt stop.[9]
Bryan LeDuff, a Veolia trainer, testified that Veolia trains its drivers to maintain a safe and proper distance behind a preceding vehicle by implementing a four-second rule.[10] According to Mr. Oliver, at the time of the accident, he was following Veolia’s four-second rule; he was about 60 to 75 feet away from the black truck when he noticed the brake lights of the truck. Mr. Oliver testified that the black truck failed to use its turning signal before turning. As Defendants note in their brief, the appropriate distance between the bus and the black truck was between 80 and 120 feet as *45 evidenced by Mr. LeDuffs testimony.[11] Defendants |9thus maintain that Mr. Oliver, in essence, was in compliance with his RTA training.
Likewise, Mr. Oliver testified that the black truck came to a stop before making a left turn without using its turning signal.[12] He also testified that he used the “stab braking” procedure to slow down rather than slamming on the brakes. In his post-accident report, Mr. Oliver noted that “a black [truck] stop short to turn left. I had to break [sic] hard when Mr. Waters came out of [his] seat onto the bus floor.” Mr. Barnes also noted in his report that the preceding vehicle made a sudden left turn, which caused “the operator [Mr. Oliver] to hit the brakes causing passenger to fall and hit right shoulder on the floor.”
Mr. Waters presented two accident reconstruction experts—Ray Burkart and Dr. Oscar Franklin Griffith, III.[13] Mr. Bur-kart noted that the stab braking procedure should not be used in vehicles with anti-lock braking systems—which the bus in question had—because it will actually take longer for the vehicle to stop. Regarding the distance between the bus and preceding vehicle, Mr. Burkart testified as follows:
|inMR. KEHOE [COUNSEL FOR MR. WATERS]:
Q. At 15 miles per hour and under the four-second rule, what should be the distance between the preceding vehicle, in this case the truck, and the bus if they are, in fact, following the four-second rule?
MR. BURKART:
A. At 15 miles per hour, it would be 88 feet.
MR. KEHOE:
Q. And if the bus driver was going 20 miles an hour, would that distance be greater, sir?
MR. BURKART:
A. Yes.
Mr. Burkart testified that after performing tests, he found that the primary cause of the accident was Mr. Oliver’s inattentiveness. He further opined that if Mr. Oliver was incorrect about the distance between the bus and the preceding vehicle, then the cause was that Mr. Oliver was following the vehicle too closely.
Dr. Griffith testified that if Mr. Oliver’s estimates were' accurate, then hé should have been able to stop the bus without applying hard brakes. He explained that if Mr. Oliver was traveling at 15 mph and was approximately 60 to 75 feet behind the black truck, Mr. Oliver should have been able to stop the bus safely.
In sum, the evidence supports the trial court’s implicit factual finding that that Mr. Oliver’s conduct fell below the general negligence standard of care. Defendants acknowledge tfiat Mr. Oliver was *46 traveling approximately 75 feet behind the black truck, which was less distance than Veolia’s policy requires. Furthermore, both Mr. Waters’ experts—Mr. Burkart and Dr. Griffin—opined that Mr. Oliver’s negligence caused the accident.
h. Defendants also contend that the trial court erred in failing to apply the “sudden emergency” doctrine. See Hickman v. S. Pac. Transp. Co., 262 La. 102, 262 So.2d 385 (1972). Defendants maintain that the black truck, not Mr. Oliver, caused a sudden emergency and that Mr. Oliver acted prudently under the circumstances. Continuing, Defendants contend that given the sudden emergency created by the black truck, they should be relieved of any liability.
In Hickman, supra, the Louisiana Supreme Court held as follows;
One who suddenly finds himself in a position of imminent peril, without sufficient time to consider and weigh all the circumstances or best means that may be adopted to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence. ... The rule applies to the defendant’s as well as the plaintiffs conduct; it is, therefore, appropriate in a consideration- of fault as it bears upon contributory negligence; -
262 La. at 112-13, 262 So2d. at 389. As Mr. Waters points out, the jurisprudence has consistently held that the sudden emergency doctrine does not apply to situations in which the party asserting the doctrine was also negligent. See State Farm Mut. Auto. Ins. Co. v. LeRouge, 07-0918, p. 18 (La. App. 4 Cir. 11/12/08), 995 So.2d 1262, 1275 (citations omitted); see also Williams v. Melancon, 08-1155, p. 4 (La. App. 4 Cir. 4/1/09), 9 So.3d 310, 313. Given the record supports a finding that Mr. Oliver was also negligent, the sudden emergency doctrine is inapposite.
Finding the trial court was not manifestly erroneous in finding Mr. Oliver’s actions fell below the standard of care, we turn to the issue of causation. The trial court was presented with conflicting testimony on this issue.
| ^Defendants do not dispute the accident caused Mr. Waters to injury his shoulder and that his shoulder injury required surgery. Defendants, however, dispute any post-August 15, 2011 treatment, when they claim Mr. Waters was discharged from care and released to regular work duty. They thus contend that Mr. Waters’ post-surgery ’ shoulder pain and neck pain were not caused by the accident. According to Defendants, Mr. Waters failed to establish with reasonable certainty that he suffered a residual disability caused by the accident.
As noted earlier in this opinion, Mr. Waters was transported from the scene of the accident to Touro Hospital by ambulance and treated for his injuries. At the hospital, x-rays wei'e taken, Mr. Waters was prescribed medication and given an arm sling, and he was instructed to follow up with his primary care physician. Mr. Waters subsequently sought treatment by his primary care physician, Dr, Henry Evans. Dr. Evans noted that Mr, Waters was experiencing pain in his right shoulder, arm, and hand. Dr. Evans referred Mr. Waters to an orthopedic surgeon, Dr. 'Kevin Watson.
At trial, Dr. Watson testified that x-rays from Touro revealed mild degenerative changes of the shoulder joint, as well as a significant subacromial spur in the shoulder. After reviewing a MRI of Mr. Waters’ shoulder, Dr. Watson discovered that Mr. Waters had a full thickness tear of the *47 right rotator cuff. On December 3, 2010, Mr. Watson performed surgery, on Mr. Waters’ right shoulder to repair the torn rotator cuff and biceps tenotomy. Dr. Watson testified that Mr. Waters’ shoulder injuries were likely degenerative in nature. Although he initially | ^testified that there was no definitive way to determine from the MRI if the rotator cuff tear was from trauma or degeneration, Dr. Watson testified that he found some blood in the rotator cuff during surgery, which he attributed to an acute injury. Dr. Watson further testified that Mr. Waters never mentioned he was experiencing neck pain.
After surgery, Mr. Waters underwent physical therapy. On February 28, 2011, while in physical therapy, Mr. Waters complained of neck pain on his right side. Mr. Waters testified that he never received treatment for shoulder or neck pain before this accident. Dr. Watson last saw Mr. Waters on June 23,2011, at which time Dr. Watson noted that Mr. Waters still had aching pains and weakness of the right shoulder. Thereafter, Mr. Waters continued treatment with Dr. Evans. During that time, Dr. Evans’ notes indicated that Mr. Waters continued to experience pain in his right shoulder and arm and difficulty lifting objects more weighing than five pounds.
On January 8, 2014, Mr. Waters sought treatment from Dr. Laxman Kewalramani, a physiatrist, for continued pain in his neck, right shoulder, and right hand. Dr. L. Kewalramani prescribed physical therapy and medication. Following an MRI of the cervical spine, Dr. .Dropadi Kewalra-mani—an expert in physical medicine and electrodiagnostiocs and rehabilitation specialist—diagnosed Mr. Waters with three cervical disc herniations as well as spasm in the cervical I ^region.[14] Dr. D. Kewalra-mani also found that Mr. Waters was symptomatic with cervieal radiculopathy and had a small tear of the infraspinatus tendon. She prescribed physical therapy and medication.
Dr. D. Kewalramani testified that she reviewed Mr. Waters’ médicál records, including his records pre-dating the accident. Based on her review and multiple physical examinations, she opined that the accident caused the torn rotator cuff, the herniation of the discs, and radiculopathy. She assigned a total permanent partial disability rating of twenty-rtwo percent (22%)—fifteen percent (15%) assigned due to his cervical injury and seven percent (7%) assigned due to his shoulder injury— and found that Mr. Waters has permanent functional restrictions. She further opined that Mr. Waters would live with some degree of pain in his neck and his right shoulder for the remainder of his life. Dr. D. Kewalramani still further opined that Mr. Waters is unable to return to his prior employment.
On July 2, 2015, Dr. Kenneth Vogel, a neurosurgeon, evaluated Mr. Waters. He opined that given the manner in which Mr. Waters fell, Mr. Waters “probably wrenched his neck and his shoulder simultaneously.” Dr. Vogel explained that neck and shoulder injuries can overlap and cause a mixed set of symptoms to the extent that pain in the shoulder can mask a pain in the neck. He opined that Mr. Waters sustained a herniated cervical disc as a result of the October 22, 2010 | ^accident. Dr. Vogel recommended that Mr. Waters continue conservative care, physical therapy, and medication pursuant to Dr. D. Kewalramani’s instructions.
Dr. Gordon Nutik, Defendants’ orthopedic surgeon expert, performed an indepen *48 dent medical examination on Mr. Waters. Dr. Nutik opined that he observed cervical changes in Mr. Waters’ MRI that were degenerative in nature based on the uniformity of the changes. Dr. Nutik further opined that Mr. Waters’ cervical pain was unrelated to the accident.
Dr. Watson last saw Mr. Waters on June 23, 2011. On July 1, 2011, Dr. Watson’s office prepared a “Patient Status Sheet” form to transmit to the insurance company handling Mr. Waters’ disability claim. On that form, Dr. Watson noted that Mr. Waters could return to “regular duty” on August 15, 2011. The form also noted that Mr. Waters was restricted from lifting, pushing, or pulling anything over twenty pounds. Dr. Watson explained that a Patient Status Sheet is “used as guidelines that are continually updated as the patient progresses” and that he would defer to Mr. Waters’ treating physician regarding his current condition and complaints. Nonetheless, Dr. D. Kewalramani testified that during her review of the medical records, she failed to find any record formally discharging Mr. Waters.
“ Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.’” Menard v. Lafayette Ins. Co., 09-1869, p. 15 (La. 3/16/10), 31 So.3d 996, 1007 (quoting Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989)). “When [ ^findings are based on determinations regarding the credibility of a witness, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings.” Holden, 44,242 at p. 4 (La. App. 2 Cir. 5/13/09), 13 So.3d at 224. This rule— that questions of credibility are for the trier of fact—also applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Papania v. State ex rel. Bd. of Sup’rs of Louisiana State Univ., 12-0551, p. 9 (La. App. 4 Cir. 1/9/13), 108 So.3d 256, 262 (citing Hanks v. Entergy Corp., 06-477, pp. 23-24 (La. 12/18/06), 944 So.2d 564, 580-81; Lasyone v. Kansas City Southern R.R., 00-2628, p. 13 (La. 4/3/01), 786 So.2d 682, 693). “Credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error.” Id.
Although the trial court was presented with conflicting medical testimony, both Dr, D. Kewalramani and Dr. Vogel testified that the accident caused Mr. Waters’ shoulder and neck injuries. We thus cannot conclude that the trial court was manifestly erroneous in finding both Mr. Waters’ shoulder and neck injuries and his residual injuries were caused by the accident.

Comparative fault

As noted, Mr. Waters also appeals. In his appeal, Mr. Waters contends that the trial court erred in allocating 30% of the fault to the preceding vehicle—the black truck. He contends that Mr. Oliver’s speeding and following the preceding vehicle too closely were the sole cause of the accident. Mr. Waters thus contends |17that the Defendants should be found 100% at fault and liable for the entire amount of damages awarded.
Allocation of fault is a factual matter within the sound discretion of the trier of fact, and this determination will not be disturbed on appeal in the absence qf manifest error. See Great W. Cas. Co. v. State ex rel. Dep’t of Transp. & Dev., 06-1776, p. 7 (La. App. 1 Cir. 3/28/07), 960 So.2d 973, 977-78. This court has recognized that “ ‘[fjault in a collision is determined by judging the conduct of each mo *49 torist under all the circumstances of the particular case.’” Watson v. Hicks, 15-0046, p. 8 (La. App. 4 Cir. 5/27/15), 172 So.3d 655, 664 (quoting Soniat v. State Farm Mut. Auto. Ins. Co., 340 So.2d 1097, 1099-100 (La. App. 4th Cir. 1976)). Whether the conduct at issue was the primary cause of the accident is irrelevant. Caruthers v. State, Through Dep’t of Transp. & Dev., 97-1450, p. 12 (La. App. 3 Cir. 4/15/98), 711 So.2d 420, 426. Liability may be imposed upon any party whose conduct contributed to causing the plaintiffs injuries. Id.
It is undisputed that when Mr. Oliver applied the brakes on the bus, the black truck was stopping in preparation for making a left turn. The court in Trahan v. Deville, 05-1482, pp. 5-6 (La. App. 3 Cir. 5/10/06), 933 So.2d 187, 192 (on reh’g), found that the duty on a left turning motorist is two-fold: “First, he must signal his turn for at least 100 feet prior to making the turn.” Trahan, 05-1482 at p. 6, 933 So.2d at 192 (citing La. R.S. 32:104). “Second, he must carefully examine the conditions around him to determine whether the turn can be made safely.” Id. (citing Kilpatrick v. All. Cas. & Reinsurance Co., 95-17, pp. 4-5 (La. App. 3 Cir. 7/5/95), 663 So.2d 62, 66. As noted, Mr. Oliver testified that the black truck failed to use its turning signal. Neither Mr. Waters nor Ms. Kirch recalled seeing the black truck use its turning signal. Given the facts of this case, we cannot conclude the trial court’s finding that the black truck was 30% at fault was manifestly erroneous.

General damages

The trial court awarded Mr. Waters $250,000.00 in general damages. Once again, Defendants do not dispute the accident caused Mr. Waters to injury his shoulder and that his shoulder injury required surgery. Defendants, however, claim Mr. Waters was discharged from care and released to regular work duty August 15, 2011. Defendants thus contend that since Mr. Waters was released to work full duty in August 2011, an award of $250,000.00 is excessive.
General damages involve mental and physical pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other losses of lifestyle that cannot be definitively measured in monetary terms. Hoskin v. Plaquemines Parish Government, 97-0061, p. 8 (La. App. 4 Cir. 12/1/97), 703 So.2d 207, 212. General damages inherently are speculative in nature and cannot be fixed with mathematical certainty. Burch v. SMG, Schindler Elevator Corp., 14-1356, p. 14 (La. App. 4 Cir. 4/7/16), 191 So.3d 652, 662, writ denied, 16-0807 (La. 6/17/16), 192 So.3d 767 (citing Wainwright v. Fontenot, 00-0492, p. 6 (La. 10/17/00), 774 So.2d 70, 74). The Louisiana Supreme Court in Bouquet v. Wal-Mart Stores, Inc., 08-0309, pp. 4-5 (La. 4/4/08), 979 So.2d 456, 459, noted the standard of review applicable to a general damages award as follows:
The standard of review applicable to a general damages award is the abuse of discretion standard. Anderson [v. Welding Testing Lab., Inc.], 304 So.2d [351,] 353 [La. 1974)]; Coco v. Winston Indus., Inc., 341 So.2d 332, 335 (La. 1976). The trier of fact is afforded much discretion in assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the evidence firsthand. Duncan [v. Kansas City So. Ry. Co.], 00-0066, p. 13 [(La. 10/30/00)], 773 So.2d [670], 682. “Vast discretion is accorded the trier of fact in fixing general damage awards.”); Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829, 834 (La. 1991). An appellate court may disturb a damages award only after an articulated analysis of the facts reveals an abuse of disere *50 tion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La. 1993); Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The role of an appellate court in reviewing a general damages award is not to decide what it considers to be an appropriate award but rather to review the exercise of discretion by the trier of fact. Duncan, 00-0066, p. 13, 773 So.2d at 682-83; Youn, 623 So.2d at 1260. To determine whether the fact finder has abused its discretion, the reviewing court looks first to the facts and circumstances of the particular case. Theriot, 625 So.2d at 1340; Youn, 623 So.2d at 1261.
Id. A trial court is “in the best position to place a quantum amount on the injuries suffered as long as such award does not shock the conscious.” Ruffin v. Burton, 08-0893, p. 9 (La. App. 4 Cir. 5/27/09), 34 So.3d 301, 306.
.Mr. Waters testified that his life has been derailed since the accident occurred. Before the accident, he was working between 50 to 52 hours a week at the Sheraton. After the accident, he could not continue working at the Sheraton because he could not lift or carry 40 to 50 pounds, which the Sheraton job frequently required. As a result, he lost his job and benefits at the Sheraton. He also had difficulty paying bills, including his mortgage. He. was forced to take out a reverse mortgage. Mr. Waters also had difficulty finding comparable work. He Unacknowledged that before the accident, he started a tour guide business giving tours in New Orleans and writing a book about slavery. Since the accident occurred, Mr. Waters has been able to give more tours and has continued writing his book, but it is taking him longer than expected due to his physical limitations. Mr, Waters testified that he felt angry and disgusted and that he felt like he lost control of his life.
■Contrary to Defendants’ contentions, Mr. Waters was not discharged on August 15, 2011 and instructed to return to regular duty work. Mr. Waters has been under continued treatment for his shoulder and neck injuries since the accident. Mr. Waters underwent surgery to repair a rotator cuff tear approximately two months after the accident. Despite this surgery and extensive physical therapy, he continued to experience pain, which led to the discovery of the herniated cervical discs. Dr. D. Kew-alramani related the herniated cervical discs to the accident. Both injuries caused a 22% permanent partial disability of the whole body. At the time of trial, Mr. Waters was functionally restricted from picking up, pushing, or pulling weight greater than twenty. pounds. Moreover, Dr. D. Kewalramani testified that Mr. Waters has not been pain-free since she began treating him and that he vyill continue to be in some pain and require care for the remainder of his life. Accordingly, we cannot conclude that the trial court abused its broad discretion in awarding $250,000.00 in general damages.

Special damages

12iThis court in Watson, supra, outlined the standard for reviewing an award of special damages as follows:
Special damages are defined as “those which either must be specially pled or have a ‘ready market value,’ i.e. the amount of damages supposedly can be determined with' relative certainty,” Wainwright v. Fontenot, 00-0492, p. 5 (La. 10/17/00), 774 So.2d 70, 74. Certain types of special damages, including medical expenses, are easily measured. Smith v. Escalon, 48,129, p. 10 (La. App. 2 Cir. 6/26/13), 117 So.3d 576, 583. A plaintiff is required to prove special damages by a preponderance of the evi *51 dence. Mack v. Wiley, 07-2344, p. 14 (La. App. 1 Cir. 5/2/08), 991 So.2d 479, 489. The standard of review applicable to an award of special damages is the manifest error standard. Kaiser v. Hardin, 06-2092, pp. 11-12 (La. 4/11/07), 953 So.2d 802, 810.
15-0046 at p. 21, 172 So.3d at 672. The trier of fact is entitled to wide discretion in assessing the appropriate amount of special damages, which is given great deference on review. Menard, 09-1869 at p. 14, 31 So.3d at 1007 (citing Guillory v. Lee, 09-0075, p. 14 (La. 6/26/09), 16 So.3d 1104, 1116; Wainwright, 00-0492 at p. 6, 774 So.2d at 74). The reviewing court “must review the entire record to determine whether the trial court’s finding was clearly wrong .or manifestly erroneous.” Menard, 09-1869 at pp. 14-15, 31 So.3d at 1007. The issue to be resolved on review is not whether the fact finder was right or wrong, but whether the fact finder’s conclusion was a reasonable one. Id.
Defendants contend that the trial court erred in awarding special damages for future medical expenses and for the loss of past and future earning capacity. As noted above, the . trial 'court made the following awards: (i) future medical expenses |22of $111,947.64; (ii) past loss of earning capacity of $112,256.00; and (iii) future loss of earning • capacity of $145,894.00. We address separately each award.[15] '

Future medical expenses

Defendants contend that the most of Mr,. Waters’ future medical expenses were related to the treatment of his cervical injury, which was unrelated to the accident. Defendants thus contend that the future medical expenses award should be reduced to the amount their expert, Mr. Cliffe, calculated for future treatment of Mr. Waters’ shoulder.[16] We disagree.
“[A]n award for future medical expenses is in great measure highly speculative and not susceptible to calculation with mathematical certainty.” Menard, 09-1869 at p. 13, 31 So.3d at 1006 (citation omitted); see also Hobgood, 14-0581 at pp. 10-11, 156 So.3d at 1251.
*52 laaDr. D. Kewalramani prepared a life-care plan detailing Mr. Waters’ future medical needs for the next ten years. In the life-care plan, Dr. D. Kewalramani provided detailed estimates of Mr. Waters’ future medical expenses that stemmed from his accident-related injuries. Dr. Vo-gel approved Dr. D. Kewalramani’s life-care plan for Mr. Waters. Dr. Wolfson testified that he calculated Mr. Waters’ total future medical expenses based on Dr. D. Kewalramani’s life-care plan. Dr. Wolf-son testified that future medical expenses for the next ten years amounted a present value to $111,852.00.
Dr. Carla Seyler, Defendants’ vocational rehabilitation counselor and life-care planning expert, also prepared a life-care plan for Mr. Waters; Dr. Nutik assisted in the preparation of that plan. Mr. Cliffe testified that using Dr. Seyler’s life-care plan, he calculated Mr. Waters’ future medical expenses would be between $5,482.00 and $6,348.00. The plan, however, failed to incorporate any care for Mr. Waters’ neck injury; it focused solely on his rotator cuff tear.
Although the trial court was presented with conflicting testimony, a trial court’s determinations regarding the credibility of witnesses, including experts, will not be disturbed absent manifest error. See Pa-pania, supra. Given the evidence, we cannot conclude the trial court was manifestly erroneous in awarding $111,947.64 for his future medical expenses.[17]

Future loss of earning capacity

| ¡^Defendants contend that Mr. Waters failed to establish that he was entitled to an award for future loss of earning capacity. Defendants argue that since Dr. Watson released Mr. Waters to regular duty on August 15, 2011, Mr. Waters’ future earning capacity should be reduced. Defendants further contend that the trial court failed to consider the continued growth of Mr. Waters’ tour guide business.
In Finnie v. Vallee, 620 So.2d 897, 900-01 (La. App. 4th Cir. 1993), this court summarized the principles governing the review of an award for the loss of earning capacity as follows:
Loss of.earning capacity is not the same as lost wages. Rather, earning capacity refers to a person’s potential. Earning capacity is not necessarily determined by actual loss. While the plaintiffs earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiffs lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity. Hobgood v. Aucoin, 574 So.2d 344, 346 (La. 1990). The trial court should consider whether and how much the plaintiffs current condition disadvantages him in the work force. The trial court should thus ask itself what the plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition.
The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiffs condition prior to the accident, his work record prior to and *53 after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the • amount of work life remaining, inflation, and the plaintiffs employment opportunities before and after the accident. Sherlock v. Berry, 487 So.2d 555, 558 (La.App. 4th Cir.1986). While the plaintiff at all time has the burden of persuasion by the preponderance of the evidence regarding his earning capacity before and after the accident, proof need only be that which would reasonably establish the claim. Expert testimony of an economist might best prove this type of loss. However, the plaintiffs own testimony, if credible and truthful, may suffice in proving his claim. Sherlock v. Berry, supra at 558.
19fJd. (footnote omitted); see Hammons, 12-0346, 12-0347 at p. 6, 101 So.3d at 1011; Wendel, 14-0002 at pp. 8-9, 151 So.3d at 835.
Citing Daigle v. U.S. Fid. & Guar. Ins. Co., 94-0304, p. 18 (La. App. 1 Cir. 5/5/95), 655 So.2d 431, 442-43, Defendants contend that when contradictory medical testimony regarding a plaintiffs disability status is presented, appellate courts have found that the evidence failed to establish with reasonable certainty that the plaintiff suffered a residual disability caused by the accident. Daigle, however, is distinguishable from this case. In Daigle, the plaintiff was in the personnel basket of a crane when the crane tipped over causing the personnel basket to fall to the ground and plaintiff to sustain injuries to his neck, shoulder, low back and wrist and a temporal mandibular joint problem. Daigle, 94-0304 at pp. 2, 8, 655 So.2d at 434-37.The jury awarded plaintiff $5,788.63 for past medical expenses and $2,789.85 for “Lost wages (past, present, future) and loss of earning capacity.” Daigle, 94-0304 at p. 3, 655 So.2d at 434, 434. The jury, however, failed to allocate the latter award between past lost wages and loss of future wages or loss of earning capacity Daigle, 94-0304 at p. 15, 655 So.2d at 441. The plaintiff filed a motion for JNOV seeking to increase the damages award, which the trial court denied. Daigle, 94-0304 at p. 4, 655 So.2d at 435.
The appellate court found that given the jury awarded the plaintiff past medical expenses but not future medical expenses, the jury must have concluded that the plaintiff was capable of returning to work as of the time of trial. Daigle, 94-0304 at p. 15, 655 So.2d at 441. The appellate court thus assumed that the jury 12f;awarded past lost wages only but not future loss of earnings or loss of earning capacity. Daigle, 94-0304 at pp. 17-18, 655 So.2d at 442. Furthermore, based on the conflicting medical testimony regarding the extent of the plaintiffs disability and his ability to return to work, the appellate court found that reasonable people could differ regarding whether the future loss of earnings or loss of earning capacity award was abusively low; thus, the trial court correctly denied the motion'for JNOV. Id. The appellate court also found that since the medical testimony was contradictory, the jury did not abuse its discretion in refusing to award plaintiff damages for future loss of earnings or loss of earning capacity. Daigle, 94-0304 at p. 18, 655 So.2d at 442-43.
In the present case, Dr. D. Kewalramani opined that Mr. Waters has a total permanent partial disability rating of 22% and permanent functional restrictions. Mr. Waters was not officially instructed to return instructed by Dr. Watson to return to regular duty on August 15, 2011. Dr. Watson testified that he had not treated Mr. Waters since June 23, 2011, and thus he would defer to Mr. Waters’ treating physi *54 cian regarding his current condition and complaints.
Dr. Bobby Roberts, Mr. Waters’ vocational evaluation expert, testified that he performed various vocational tests on Mr. Waters. Dr. Roberts opined that Mr. Waters had limited range of motion, difficulty working with his right arm parallel to tabletop height, and limited endurance. He noted that Mr. Waters had difficulty maintaining his head and neck flexed throughout the sedentary test. Dr. Roberts thus concluded that Mr. Waters was not employable in a competitive labor market la7for sedentary work. Although Dr. Seyler disagreed with Dr. Roberts’ assessment, she conceded that Mr. Waters requires a sedentary or light,' physical exertion job.
Furthermore, Dr. Wolfson testified that after a credit for $10,000 per year from Mr. Waters’ other income (his tour guide business, for example), his total future lost earning capacity until age 75 would be $145,894.00. Mr. Waters testified that he hoped to be like his father and work until 81 years old.
Given the evidence, we cannot conclude the trial court abused its discretion' in awarding $145,894.00 for. loss of future earning capacity.
DECREE
For the forgoing reasons, the trial court’s judgment is affirmed.
AFFIRMED

. Although the trial court’s judgment awarded $486,880.989 in damages, we round the award to $486,881.00.00 for ease of discussion.

. On this date accident, Mr. Waters was 61 years old.

. The priority seating section is located in the front of the bus. In the priority seating section, there are approximately six seats—three seats on each side of the bus. The priority seats face each other, rather than the front of the bus.

. At the time of the accident, Mr. Oliver was employed by Veolia—the contracted management operator of the RTA buses. Earlier, Mr. Oliver was employed by Transit Management of Southeast Louisiana (“TMSEL”), which managed the RTA bus operations until around September 2009. The parties stipulated that Mr. Oliver was in the course and scope his employment with Veolia at the time of the October 22, 2010 accident.

. See Freeman v. Zara's Food Store, Inc., 16-0445, p. 14 (La. App. 4 Cir. 11/2/16), 204 So.3d 691, 700 ("[t]he general rule is that an amendment to add a party to a judgment is a change of substance, not of phraseology, that can only be accomplished by motion for a new trial or on appeal.”).

. Veolia asserts the following five assignments of error:
1. The trial court’s finding of liability upon the defendants based upon the evidence was, in effect, a finding that the defendants were a "common carrier,” in violation of Louisiana law.
2. The trial court erred in not applying the sudden emergency doctrine based upon the evidence,
3. The trial court erred in finding that plaintiff's continued right shoulder treatment after being released for full duty was caused by the October 22, 2010 accident,
4. The trial court erred in finding that plaintiff’s cervical spine injuries were caused by the October 22, 2010 accident.
5. The trial court erred in its award to Plaintiff of special damages for future medical expenses and loss of past and future earning capacity.
Mr. Waters’ sole assignment of error is as follows: "The Trial Court correctly found that Mr. Oliver was at fault in causing the accident, but committed legal error in finding the black truck at 30% fault since Mr.. Oliver knew the vehicles would bé braking at the intersection'and his own negligence created an emergency situation necessitating hard braking.”

, See La. R.S. 45:162(5)(a), which defines "common carrier” as follows:'
"Common carrier by motor vehicle” means any person, other than a contract carrier by bus, the essential nature of whose business comprises engaging in, soliciting, or accepting household goods, passengers, or waste, for intrastate transportation for hire, charge, or compensation as an employment or holding himself out as so available to the public generally and indiscriminately for such business, whether or not the business is conducted over a regular route, between fixed termini, within a defined area, or upon a regular or irregular schedule.

. The duty-risk analysis requires that a plaintiff prove the following six factors; (1) the defendant had a duty to conform his conduct to a specific standard of care; (2) the defendant failed to conform his conduct to the appropriate standard of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiffs injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages; Brewer, 09-1408 at p. 14, 35 So.3d at 240 (citing Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217, p. 6 (La. 4/3/02), 816 So.2d 270, 275-76). Whether a duty is owed is a question of law; whether a defendant failed to confirm his conduct to the appropriate standard of care and has breached a duty owed is a question of fact, Id. (citing Mundy v. Dep’t of Health & Human Res., 620 So.2d 811, 813 (La. 1993)).

. Ms. Kirch also testified that she recalled a man sitting across from her was propelled out of his seat and landed on the floor of the bus. According to Ms. Kirch, the fall looked fabricated. She further testified that she did not recall Mr. Waters being a passenger on the bus that day.

. Veolia’s company policy describes the four-second rule as follows:
Veolia Transportation Operators must establish and maintain at least a four (4) second following distance during clear, dry weather conditions to safely avoid other vehicles making a sudden stop or other unexpected maneuver
* * ⅜
Following distance should be increased when driving in night conditions, inclement weather, fog, or other adverse driving conditions.

.Mr. LeDuff originally testified that Veolia teaches its drivers to stay one to three bus lengths (which is approximately 40 to 120 feet) behind a preceding vehicle. On cross-examination, however, Mr. LeDuff testified that he teaches drivers that the safe following distance is normally two to three bus lengths, or 80 to 120 feet. He further testified as follows:
Q. So if you only—have you taught Mr. Oliver it's only 40 feet, one bus length is a good following distance?
A, No, two bus lengths. When I—go ahead.
Q. It is two to three bus lengths?
A. Right.
Q. You haven’t taught Mr. Oliver that the safe distance is only 40 feet, have you?
A. No,

. Both Mr. Waters and Ms. Kirch did not recall seeing the black truck use a turn signal.

. Dr. Griffith was certified as a physics expert with an emphasis in accident reconstruction.

. Shortly after the initial visit, Dr. L. Kewal-ramani died. Thereafter, Mr. Waters continued treatment with Dr. D. Kewalramani, who is Dr. L, Kewalramani’s wife.

. Defendants’ assignment of error regarding the trial court’s award of past lost wages may be considered waived because it was not directly addressed in their brief. See Rule 2-12.4. Regardless, this assignment of error is unpersuasive. "A claim for lost wages need not be proven with mathematical certainty; it only requires such proof- which reasonably establishes plaintiff's claim,- which includes plaintiff’s own reasonable testimony.” Wendel v. Travelers Ins. Co., 14-0002, p. 8 (La. App. 4 Cir. 10/8/14), 151 So.3d 828, 835 (citation omitted). A plaintiff seeking damages for past lost wages ‘‘bears the burden 'of proving lost earnings and that the time missed from work was a result of the injury.' " Hobgood v. State Farm Mut. Auto. Ins. Co., 14-0581, p. 14 (La. App. 4 Cir, 12/17/14), 156 So,3d 1244, 1253 (quoting Hammons v. St. Paul, 12-0346, p. 9 (La. App. 4 Cir. 9/26/12), 101 So.3d 1006, 1012). Dr. Shael Wolfson, Mr. Waters’ forensic economics expert, testified that he reviewed documents relating to Mr. Waters' wages and income. After deducting income earned from other employment, Dr. Wolfson , calculated Mr. Waters’ past lost wages from the date of injury to trial amounted to $112,256.00. Dan Cliffe, Defendants’ expert, testified that he calculated Mr. Waters’ past lost wages from injury to trial based on the assumption that Mr. Waters could return to regular duty work on August 15, 2011 earning minimum wage. Based on this assumption, Mr. Waters’ total past lost wages was approximately $96,500.00. As noted, Dr. Watson neither discharged Mr. Waters from care not instructed him to return to regular duty work on August 15, 2011.

. At trial, the parties stipulated that Mr, Cliffe’s testimony would consist of his expert opinion regarding his analysis of Mr. Waters’ wages earned both before and after the acci- , dent,

. Dr. Wolfson testified that the value of the future medicals Mr. Waters would likely incur was $111,852.00. We thus note that the trial court’s award is slightly higher than Dr. Wolf-son’s calculations. See Ruffin, supra, (observing that a trial court is "in the best position to place a quantum amount on the injuries suffered.”).